IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

NOELLE MILESKI,                          :

     Plaintiff,                        :

vs.                                      :          CA 14-0514-C

GULF HEALTH HOSPITALS, INC.,             :
d/b/a THOMAS HOSPITAL,

     Defendant.                        :

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on the motion for summary judgment filed by

defendant Gulf Health Hospitals, Inc. d/b/a Thomas Hospital (Doc. 30),[1] along with its

brief (Doc. 33) and evidentiary submission (Doc. 31), plaintiff's response in opposition

(Doc. 36), along with her evidentiary submission (Doc. 37), and the defendant's reply

brief (Doc. 43) and additional evidentiary submission (Doc. 42).[2] The parties have

consented to the exercise of jurisdiction by the Magistrate Judge, pursuant to 28 U.S.C. §

636(c), for all proceedings in this Court. (*Compare* Doc. 7 (specifically advising the parties

that this case had been randomly assigned to him for all purposes, including trial,

directing the Clerk of Court "to send to each party, for informational purposes, a copy of

the Court's form Consent to the Exercise of Jurisdiction by a United States Magistrate

Judge," and informing the parties that "[i]f there is *no request for reassignment filed* by

*December 14, 2014,* the undersigned will treat this as a consent case pursuant to 28 U.S.C.

---

[1]     Hereinafter, the defendant will be referred to by name as Thomas Hospital.

[2]     The Court will also consider a document the defendant was allowed to file under
seal. (*See* Docs. 46 & 47.)

§ 636(c)." (emphasis in original)) *with* Doc. 9 (on December 22, 2014, the following remark was recorded on the Docket Sheet: "Because there was no request for reassignment filed by December 19, 2014, the undersigned will treat this as a consent case pursuant to 28 U.S.C. § 636(c).").) Upon consideration of the foregoing pleadings, with attachments, the Court concludes that defendant's motion for summary judgment (Doc. 30) is due to be **GRANTED IN PART** and **DENIED IN PART**.

## FINDINGS OF FACT

Noelle Mileski has a history of depression dating to her teenage years when she was sexually abused. (*Compare* Doc. 37, Exhibit A, Deposition of Melissa Noelle Mileski, at 25 *with* Doc. 46, Sealed Progress Notes of Cindy Carpenter Dated June 4, 2013.)[3] Mileski testified that her depression would "come and go" over the years (Doc. 37, Exhibit A, Mileski depo., at 30);[4] in her 20s she was successfully treated without medication by a physician but when she was going through her divorce in 2012, she was prescribed antidepressants by her general physician (*id.* at 26-27). When Mileski began her employment at Thomas Hospital in August of 2010,[5] she was not having any mental

---

[3]     Mileski is currently diagnosed with Major Depression (recurrent, severe without psychosis) and Post Traumatic Stress Disorder. (Doc. 37, Exhibit I; *see also* Doc. 37, Exhibit A, Mileski depo., at 93.)

[4]     Mileski described how depression impacts her life when "active," testifying that she,

> would't want to leave the house. I wouldn't want to talk to anyone. It made it very difficult for me to take care of my child. It made it difficult to interact with anyone outside of my house. I cried a lot.

(*Id.*)

[5]     When she was hired, Mileski went through a two-day orientation during which she was given a copy of the employee handbook. (Doc. 31, Exhibit 1, Mileski depo., at 48-49 & Exhibits 3 & 4 to Mileski depo.)

health problems (Doc. 37, Exhibit A, Mileski depo., at 30) and, therefore, did not indicate on the Initial Health History form she completed that she suffered from any chronic illness or condition (Doc. 31, Exhibit 1, Mileski depo. at 29 & Exhibit 1 to Mileski depo.). This form, of course, nowhere specifically requested information relative to mental health issues, as it did regarding diabetes, high blood pressure, heart problems, and the like. (*See id.*)

Mileski worked as a unit tech at Thomas for the duration of her employment. (*See* Doc. 37, Exhibit A, Mileski depo., at 41-42.) Plaintiff was generally assigned to the Medical Intensive Care Unit ("MICU"), a 10-bed unit where her duties were divided between general clerical work and patient care, but during some of her shifts plaintiff had to float to another unit in the hospital and work. (*Compare id.* at 41-44 *with* Doc. 31, Exhibit 1, Mileski depo., at 45-46.) During the approximately three years she was employed at Thomas Hospital, plaintiff floated to many units, including the cardiac/telemetry unit on Two North. (*See id.* at 46-48.) George Pappas was the nursing manager of the cardiac/telemetry unit (Doc. 37, Exhibit G, Deposition of George Pappas, at 17 & 20) and when a unit tech was needed to cover for a nursing assistant who was out in Pappas' unit, that unit tech would strictly assist the nurses in caring for patients (Doc. 31, Exhibit 6, Pappas depo., at 21-22 & 24-25).[6]

---

[6]     The cardiac unit employed both clerical workers and then people who would assist the nurses in caring for patients (*id.* at 25); the unit clerks in the cardiac unit do not have the necessary competencies/certifications to care for patients, whereas someone like plaintiff could perform nursing assistant tasks in that unit when she floated to it because she had the proper certification (*see id.* at 36 & 37; *cf.* Doc. 31, Exhibit 4, Deposition of Blair Nelson, at 44 (Nelson explained that if an MICU tech was needed to float to the cardiac unit, he or she would either be assigned nursing assistant tasks caring for patients or clerical/secretarial tasks, but not both)).

Blair Nelson, who was either Mileski's team leader on MICU or her nursing manager, never had any problems with plaintiff's work performance or attendance[7]; she was a good employee who was never disciplined, met all standards on her evaluations,[8] and never complained about not wanting to perform any aspect of her job, including floating to other departments. (Doc. 37, Exhibit B, Deposition of Blair Nelson, at 40-43, 48 & 89; *see* Doc. 31, Exhibit 4, Nelson depo., at 43-44 (Nelson never received complaints from other units to which plaintiff floated about plaintiff's work performance or attitude); Doc. 37, Exhibit C, Deposition of Georgie Cain, at 49 (no nursing manager ever brought to her attention any work performance, attendance or disciplinary issues involving plaintiff).) Nelson was unaware of anything particularly negative associated with working in the cardiac unit and none of her employees informed her of any negative experiences they had in floating to the cardiac unit; rather, Nelson simply appreciated that her employees preferred working in their home unit. (Doc. 37, Exhibit B, Nelson depo., at 46.)

Nelson had an open-door policy as nurse manager and encouraged all employees to let her know if anything was bothering them. (*Id.* at 63.) To this end, her employees, including Mileski, would discuss personal issues with her, including life issues and stressors. (*Id.* at 64.) For instance, Nelson knew that Mileski was going through a stressful divorce and that her problems with her soon-to-be ex-husband even encroached

---

[7]    Plaintiff was never disciplined over attendance issues. (Doc. 37, Exhibit B, Nelson depo., at 89-90.)

[8]    In particular, plaintiff's evaluation from the spring of 2013 was good. (*See* Doc. 37, Exhibit A, Mileski depo., at 51.)

on her work in the unit;[9] the nurse manager was also aware of stress plaintiff experienced associated with her special-needs child and the birth of another child while employed at Thomas, along with the grief and stress associated with her mother's death in the MICU. (Doc. 37, Exhibit A, Mileski depo., at 64-65.) According to plaintiff, Nelson also knew about the sexual abuse she suffered as a child, as plaintiff specifically told her about the abuse, and that she had started seeing Cindy Carpenter[10] in February of 2013 because her depression had returned due to her mother's death, stress from her divorce, and her history of being a victim of sexual abuse. (Doc. 37, Exhibit A, Mileski depo., at 31-35 & 37; *but cf.* Doc. 37, Exhibit B, Nelson depo., at 85-86 & 89 (Nelson's testimony that she learned about plaintiff's issues with sexual abuse as a child and teenager, about her history of depression, and that she was being treated at The Harbor only after May 31, 2013, not before).)[11] And though (in early 2013) plaintiff felt "very close to the way [she] felt before when [she] was not able to leave the house[]" (Doc. 37, Exhibit A, Mileski depo., at 31), her depression/mental health conditions did not affect her work, and she

---

[9]     Indeed, Nelson was involved in getting the hospital's telecommunications unit to block the number Mileski's husband was using to call the MICU multiple times on one particular day because this activity disrupted the unit. (*Id.* at 65.)   According to Mileski, Georgia Cain, Thomas Hospital's Division Director of Nursing (Doc. 37, Exhibit C, Cain depo., at 18), also was aware that her husband was disrupting the unit with his calls (Doc. 31, Exhibit 1, Mileski depo., at 39; *see also id.,* Exhibit 3, Cain depo., at 105).

[10]     Carpenter was director of The Harbor (*see* Doc. 37, Exhibit I), an outpatient clinic actually onsite at Thomas Hospital (*see* Doc. 37, Exhibit C, Cain depo., at 24-25), which provided psychological/psychiatric care to patients (*compare* Doc. 31, Exhibit 7, Deposition of Helena Roldan, at 19-20 (indicating there was no need for her to refer plaintiff to another facility for treatment of her depression since she had already started treatment at The Harbor for depression) *with* Doc. 37, Exhibit B, Nelson depo., at 89 (describing The Harbor as an outpatient behavioral health program)). Once plaintiff began seeing Carpenter in February of 2013 (Doc. 37, Exhibit A, Mileski depo., at 25), the psychiatrist at The Harbor began prescribing the antidepressants that her general physician had prescribed her in 2012 (*id.* at 27-28).

[11]     Nelson was also aware that plaintiff had seen EAP therapist Helena Roldan on one occasion in 2011 to cope with the stress associated with her divorce. (Doc. 37, Exhibit A, Mileski depo., at 37-38 & 103.)

did not ask for any restrictions or accommodations, because she "worked very hard to keep" these issues from impacting her work. (*Id.* at 32 & 51; *see also id.* at 87 ("I was able to do my job regardless of my medical condition.").)[12] All of this changed on May 31, 2013.

On the night of May 30, 2013, plaintiff argued with her ex-husband over the custody of her oldest son; her ex-husband threatened to take plaintiff back to court in order to have her parental rights revoked. (Doc. 37, Exhibit A, Mileski depo., at 91; *see also* Doc. 46, June 4, 2013 Progress Notes of Cindy Carpenter.) Plaintiff had nightmares and did not sleep well. (*Id.*) Mileski went to work the morning of May 31, 2013, and clocked in at 6:44 a.m. (*See* Doc. 31, Exhibit 5, Deposition of Pam Bailey, at 32; *compare id. with* Doc. 37, Exhibit A, Mileski depo., at 54-56 (though the events of the morning of May 31, 2013 are "foggy" for plaintiff and she does not specifically remember clocking in, she admits that she must have clocked in based on the attendance clock reflecting that she did so at 6:44 a.m.).) Plaintiff went to the MICU and (probably) saw that she was assigned to the cardiac unit (*see id.*, at 56); Mileski, who was in an admittedly upset/unsettled state (*see* Doc. 37, Exhibit B, Nelson depo. at 76-77 (Nelson was not told that plaintiff was specifically upset about the floating assignment, only that she was upset before she left the MICU) & 81 ("[F]rom what I understand, she showed up, was upset, and then left the unit.")),[13] left the MICU but instead of reporting to the cardiac

---

[12]     The employee handbook recognizes that "[t]he Americans with Disabilities Act (ADA) prohibits discrimination in employment because of a qualified disability[,]" and, further, that "[i]ndividuals desiring job accommodations should notify the Employee Health Department in writing." (Doc. 37, Exhibit 5 to Nelson depo., at Bates No. 000016.)

[13]     The defendant would have this Court find that what upset plaintiff and precipitated her flight from work was her assignment to the cardiac unit and, in support thereof, it relies in large measure upon the following notation by Cindy Carpenter on June 4, 2013: "She went to work Fri but learned she would be pulled to another unit. She left work without proper (Continued)

unit, she left the hospital (Doc. 37, Exhibit A, Mileski depo., at 57) without clocking out

(*compare* Doc. 31, Exhibit 5, Bailey depo., at 33-34 (no clock out time) *with* Exhibit 1 to

Bailey depo., at Bates No. 000078 & Doc. 37, Exhibit A, Mileski depo., at 57 & 58

(plaintiff's testimony that if the records show she did not clock out, then she did not

clock out))[14] or advising anyone in a supervisory capacity that she was leaving[15] (*see* Doc.

_____

notification[.]" (Doc. 46, Progress Notes of Cindy Carpenter.) This notation, however, is not particularly helpful inasmuch as it is impossible to tell whether this assignment is what upset Mileski (or made her unhappy) or whether she was already upset and emotionally fragile and simply had a mental "break" after reporting to her unit which triggered her downward spiral to a suicide attempt (*compare* Doc. 37, Exhibit C, Cain depo., at 90 (deponent's testimony that, on July 22, 2013, plaintiff informed Cobb and her that she did not talk to Nelson before leaving on May 31, 2013 because she was "not in frame of mind [to do so]") *with* Doc. 31, Exhibit 7, Roldan depo., at 29 (plaintiff told Roldan that she stayed up most of the night of May 30, 2013, and that she went to work the next day anxious and irritable)). This latter scenario is more likely, of course, given the defendant's inability to garner anyone's "eyewitness" testimony that plaintiff specifically expressed her displeasure (or that she was upset) about the assignment (*see, e.g.,* Doc. 31, Exhibit 2, Deposition of Lisa Cobb, at 135 (deponent testified that Nelson told her that plaintiff arrived at work, received her assignment, got upset about the assignment, left the unit, and did not show up to Two North); *but cf.* Doc. 37, Exhibit B, Nelson depo., at 76-77 & 80-81)), Blair Nelson's explicit testimony that the person she spoke with in the MICU unit on the morning of May 31, 2013 simply reported that plaintiff was upset prior to leaving the unit (Doc. 37, Exhibit B, Nelson depo., at 76-77 (Nelson was not told that plaintiff was specifically upset about the floating assignment); *see also id.* at 81 ("[F]rom what I understand, she showed up, was upset, and then left the unit.")) and no one ever told her that plaintiff was refusing to go to the cardiac unit and/or that she did not want to go to the cardiac unit (*id.* at 80-81), Mileski's testimony that she had no problem with working in the cardiac unit and did not recall expressing displeasure to any of her coworkers about being assigned to the cardiac unit or telling Lisa Cobb at the end of July that she was upset about that assignment (Doc. 37, Exhibit A, Mileski depo., at 56; *but cf.* Doc. 31, Exhibit 2, Cobb depo., at 198-199 (Cobb's insistence that she correctly wrote down on her notes of the July 22, 2013 meeting that plaintiff told her that she saw her assignment to float on the staffing book and got upset about the assignment, and specifically never told her that she was upset because her ex-husband had contacted her the night before threatening to take full custody of their child)), and Pappas' testimony that he had never been informed that plaintiff was unhappy about being assigned to his unit on May 31, 2013 (Doc. 31, Exhibit 6, Pappas depo., at 32).

[14]      The hospital's employee handbook, created by Infirmary Health Systems (*see* Doc. 37, Exhibit D, Cobb depo., at 32), addresses "timekeeping," in relevant manner, as follows: "All employees are required to properly record their own time (arrivals and departures) using their assigned time clock or other method of time entry each time they report to and leave work. . . . Employees are required to clock out when leaving System premises for personal reasons during a scheduled shift and clock in upon returning." (*See, e.g.,* Doc. 31, Exhibit 4 to Mileski depo., at Bates No. 000031.)

31, Exhibit 6, Pappas depo., at 23-24 (when he arrived at his unit on the morning of May 31, 2013, he was informed that Mileski had not arrived to fulfill her floating assignment to cover for one of his nursing assistants)).[16]

Blair Nelson was driving into work on May 31, 2013, when she was notified that Mileski had not reported to her assignment on the cardiac unit (Doc. 37, Exhibit B, Nelson depo., at 74); Nelson called the MICU and was informed that plaintiff was upset when in the MICU but was no longer there, information which obviously concerned Nelson since she knew plaintiff had not made it to the cardiac unit (*see id.*). Upon fielding a call from Amy Lindley, a nurse on the MICU who was a friend of plaintiff, which indicated that plaintiff was at the Fairhope Pier threatening to harm herself, Nelson drove to the pier out of her concern for plaintiff. (*Id.* at 77-79.)[17] Mileski was not

---

[15]    Because plaintiff's memory of that day is "foggy" (Doc. 37, Exhibit A, Mileski depo., at 56-57), she has no recollection whether she clocked out, advised Nelson or Pappas that she was leaving, or whether anyone gave her permission to leave (*id.* at 57-58 & 76-77).

[16]    When plaintiff did not show up in the cardiac unit for her floating assignment and handoff (*see* Doc. 31, Exhibit 1, Mileski depo., at 52 (describing a handoff as a process in which the employee from the previous shift informs his or her replacement of what happened during the previous shift)), Pappas covered the shift as nursing assistant on May 31, 2013. (*See* Doc. 31, Exhibit 6, Pappas depo., at 24 & 26.) Covering shifts for a nurse or nursing assistant is not atypical for a nurse manager (*compare id.* at 24 & 29 *with* Doc. 37, Exhibit B, Nelson depo., at 24), and, in fact, Nelson resigned her position as nurse manager because she frequently had to fill-in for nurses on her unit and spent a large amount of her time at the hospital and away from her family (*id.*). On May 31, 2013, when Pappas filled in for Mileski, his unit did not go below the proper patient-nurse/nursing assistant ratio and no patient on the unit received detrimental treatment. (Doc. 31, Exhibit 6, Pappas depo., at 28.) The cardiac unit at Thomas Hospital is a 32-bed unit and while the patients on Pappas' unit are not as sick or acute as the patients in the 10-bed MICU, his unit can be busier than the MICU, as it was on May 31, 2013 with a lot of discharges and admissions. (*See id.* at 29 & 33-36.)

[17]    Nelson let Georgie Cain, her boss, know what was going on with Mileski. (*Compare id.* at 79 *with* Doc. 37, Exhibit C, Cain depo., at 18, 23 & Doc. 31, Exhibit 3, Cain depo., at 32.) Later that day, Cain had another conversation with Nelson in which Nelson advised her that Mileski had been assigned to float to Two North but did not arrive on that unit. (*Id.* at 34-35.) Cain instructed Nelson to advise Lisa Cobb of the situation. (*Id.*) According to Cain, Nelson never told her that Mileski "refused" her floating assignment. (*Id.*; *see also id.* at 43.)

at the pier when Nelson arrived (Doc. 37, Exhibit B, Nelson depo., at 79); however, Nelson learned when she arrived at Thomas Hospital that plaintiff had been transported to the hospital's emergency room (*id.* at 92-93).[18] A patient care worksheet dated May 31, 2013, reflects that plaintiff was having suicidal ideations and took a drug overdose, consisting of 3½ Ambien, 10 Ultram, 2 Aleve tablets, and 10 allergy pills. (Doc. 37, Exhibit H.)[19]

After some form of treatment in Thomas Hospital's emergency department, Mileski was transferred and admitted to Mobile Infirmary Medical Center for further treatment. (*Compare* Doc. 37, Exhibit B, Nelson depo., at 93 *with* Doc. 37, Exhibit A, Mileski depo., at 60.)

Mileski was discharged from the Mobile Infirmary on Sunday June 2, 2013 (*id.*) and spoke with Nelson by phone that afternoon (*id.* at 60-61). Mileski was worried about her job because she left work on May 31, 2013 and, therefore, she telephoned Nelson to

---

[18]   It was Nelson's belief that Amy Lindley called 911 and directed emergency responders to the pier. (*Id.* at 78; *compare id. with* Doc. 37, Exhibit A, Mileski depo., at 59-60 (Amy Lindley informed plaintiff that she (Lindley) called the paramedics after speaking with plaintiff and learning that she had taken an overdose of medication).) When Nelson learned of plaintiff's presence in the emergency room, she spoke to the team leader in the emergency department and asked the team leader to restrict visitors for plaintiff in order to maintain her privacy. (Doc. 37, Exhibit B, Nelson depo., at 68-69 & 93.)

[19]   It is clear to the Court, that after plaintiff left the hospital, she went home, gathered Ambien, Ultram, Aleve and allergy tablets, traveled to the Fairhope pier and attempted suicide by taking the medication she had gathered. (*Compare id. with* Doc. 37, Exhibit J ("On 5-31-13, she became overwhelmed [with] stress (work & ex-husband) and took OD of meds.") and Doc. 31, Exhibit 7, Roldan depo., at 29 (plaintiff told the deponent on June 21, 2013, that she had an argument with her husband on May 30, 2013 and stayed up most of the night, she went to work anxious and irritable, when she got to work she was asked to work in another unit but instead of reporting to the other unit she left work, went home, got prescription medication, went to the park and took "it all.").)

This was not plaintiff's first attempted suicide, as the record reflects a history of other suicide attempts. (*See* Doc. 37, Exhibit J ("[H]x of 3 suicide attempts.").)

ask her what she needed to do about work (*id.* at 61). According to Mileski, Nelson informed her that "at worst" she "would have to go through The Harbor program and possibly be written up[]" (*id.* at 61; *but cf.* Doc. 37, Exhibit B, Nelson depo., at 108 (Nelson's testimony that she did not so inform plaintiff and that she would not make such statements for fear of giving someone false information)), but also informed her that she (Nelson) would have to speak with Lisa Cobb in the Human Resources Department (*compare* Doc. 37, Exhibit A, Mileski depo., at 62 (Mileski testified that Nelson did not tell her to come back to work during this telephone call) *with* Doc. 37, Exhibit B, Nelson depo., at 95 & Doc. 31, Exhibit 4, Nelson depo., at 97-98 (Nelson testified that she informed Mileski that she would have to talk to human resources about plaintiff's return to work because it was her policy to consult human resources on all human resources issues, which she believed included a situation in which an employee reports to work but does not "pick up" her assignment).) On Monday, June 3, 2013, Mileski went to Thomas Hospital and spoke to Nelson and Paula Smith, plaintiff's team leader, and Nelson again stated that she needed to speak to Cobb in human resources and that plaintiff was not to report to work until she spoke with Cobb.[20] (*Compare* Doc. 37, Exhibit A, Mileski depo., at 62-63 *with* Doc. 37, Exhibit B, Nelson depo., at 106-108.) Nelson remembers plaintiff telling them (that is, Smith and her) about her childhood issues and that she had been suffering from depression for several months prior to May 31, 2013. (*See id.* at 105-107.)

---

[20]     Nelson would consult with Cain and Cobb before disciplining members of her staff. (*See* Doc. 37, Exhibit B, Nelson depo., at 35 & 37.) For her part, Cobb testified that she did not learn of the events of May 31, 2013, specifically that plaintiff tried to harm herself by taking pills, until she spoke with Nelson for the first time on June 3, 2013. (Doc. 37, Exhibit D, Cobb depo., at 134-135.)

Between June 3, 2013 and June 10, 2013, when plaintiff signed the Employee Assistance Program ("EAP") Referral Form presented to her (*compare* Doc. 37, Exhibit B, Nelson depo., at 120-121 *with id.*, Exhibit 7 to Nelson depo., Bates No. 000001), Nelson not only spoke with Cobb (*see* Doc. 37, Exhibit B, Nelson depo., at 104-105 & 109; Doc. 31, Exhibit 4, Nelson depo., at 110-113 & 115-118) but, as well, there were a number of telephone and email communications between Cobb and Cain[21] (*see* Doc. 31, Exhibit 3, Cain depo., at 38, 40, 54-56, 62-63 & 70-73; Doc. 37, Exhibit C, Cain depo., at 50- 52) and Cobb and Randy Stembridge (*see* Doc. 31, Exhibit 2, Cobb depo., at 144-145 & 156).[22] Although there was talk among these four individuals that plaintiff should be terminated for job abandonment, or terminated with 5 EAP sessions, in line with what they viewed as the hospital's consistent practice (*compare* Doc. 37, Exhibit C, Cain depo., at 63-64 (the consistent hospital practice was to fire employees for job abandonment) and Doc. 31, Exhibit 4, Nelson depo., at 112 (from a policy standpoint, the typical response to job abandonment is termination) *with* Doc. 131, Exhibit 2, Cobb depo., at 144-145 & 155-156 (at some point on June 7, 2013, the decision had been made by her and Stembridge to

---

[21]      Cobb's investigation into the events of May 31, 2013, consisted of speaking to Nelson, Pappas, and Cain. (Doc. 131, Exhibit 2, Cobb depo., at 142-151, 153 & 154; *but cf.* Doc. Doc. 31, Exhibit 6, Pappas depo., at 31 (witness could not remember Cobb contacting him about his knowledge of May 31, 2013).) Essentially, all Cobb did was to confirm that plaintiff got her assignment and then left the hospital, which she considered job abandonment. (Doc. 31, Exhibit 2, Cobb depo., at 144; *compare id. with* Doc. 37, Exhibit B, Nelson depo., at 104 (Nelson's testimony that Cobb informed her that it constitutes job abandonment for an employee to clock into work but not report to her assignment).) Cobb did acknowledge that she was cognizant (based on information relayed to her by Nelson) that plaintiff had tried to take her own life on May 31, 2013 (Doc. 31, Exhibit 2, Cobb depo., at 162-163), and Nelson believes she told Cobb that plaintiff had "stressful things going on." (Doc. 37, Exhibit B, Nelson depo., at 109.)

[22]      Stembridge was the director of employee relations. (*See* Doc. 37, Exhibit D, Cobb depo., at 83.)

terminate plaintiff but let her have 5 EAP sessions)),[23] it was ultimately decided that plaintiff should be referred to EAP for mandatory treatment (*see* Doc. 131, Exhibit 2, Cobb depo., at 156).[24] According to Cobb, Stembridge is the person who "stepped" back and convinced her that the best course to follow so that plaintiff could get treatment without losing her benefits[25] was a referral for mandatory EAP treatment. (Doc. 31, Exhibit 2, Cobb depo., at 157.) Thus, plaintiff was not terminated at that time (*see id.* at 162 (no termination decision was written down at this time));[26] instead, based on the referral to mandatory EAP, plaintiff applied for and was approved for family medical leave under the Family Medical Leave Act ("FMLA")[27] and short-term disability

---

[23]     There was no form of discipline discussed other than termination (Doc. 31, Exhibit 4, Nelson depo., at 116) and, indeed, plaintiff was at no time suspended or written up as a result of the events of May 31, 2013 (*see* Doc. 37, Exhibit B, Nelson depo., at 72-73).

[24]     Nelson did not want to terminate plaintiff (Doc. 37, Exhibit B, Nelson depo., at 112); however, she never expressed this position to Cobb (*id.* at 124).

[25]     Plaintiff's benefits would have ended at midnight on the date of termination. (*See* Doc. 37, Exhibit C, Cain depo., at 40.)

[26]     Interestingly, even though both Cain and Cobb testified that the human resources director (Cobb) and the director of employee relations (Stembridge) only made employment recommendations (*compare* Doc. 37, Exhibit D, Cobb depo., at 201-202 *with* Doc. 37, Exhibit C, Cain depo., at 58-59), it appears that Cobb and Stembridge were driving the "train" with respect to Mileski in this regard given the tenor of Cain's June 7, 2013 email to Cobb: "So no termination?" (*See* Doc. 31, Exhibit 3, Cain depo., at 71-72; *compare id. with* Doc. 37, Exhibit 3 to Cain depo., Bates No. 000007.)

[27]     Once plaintiff completed the proper forms, approval for family medical leave was automatic. (Doc. 37, Exhibit F, Deposition of Pam Bailey, at 42-43.) According to Cobb, on June 10, 2013, plaintiff initially would have been placed on unpaid administrative leave of absence ("LOA")—not suspended—but that when the FMLA certification was processed, the payroll system would be changed based upon backdating the approved FMLA leave to May 31, 2013. (*See* Doc. 37, Exhibit D, Cobb depo., at 100-102.) Before retroactive application of FMLA leave to May 31, 2013, the days plaintiff missed were not counted against her with respect to the hospital's time and attendance policy. (*Id.* at 102.)

beginning May 31, 2013[28]. (*See* Doc. 37, Exhibit F, Bailey depo., at 40-45.)[29] Cobb testified that this "action" reflected an exception to the policy for immediate termination for job abandonment only with respect to extending plaintiff's benefits; according to Cobb, the hospital was "putting off" a decision on job abandonment pending completion of EAP and consideration of any information or mitigating factors that arose, though she admitted that at that time (i.e., June 7, 2013), unless something unknown came to the attention of human resources, the process would conclude in plaintiff's termination. (*See* Doc. 31, Exhibit 2, Cobb depo., at 157-161.)

Plaintiff met with Blair Nelson and Georgia Cain on June 10, 2013 and executed the EAP[30] referral form. (*Compare* Doc. 31, Exhibit 3, Cain depo., at 75 & Doc. 31, Exhibit

---

[28]     Plaintiff was actually paid for one hour of work on May 31, 2013 (Doc. 31, Exhibit 5, Bailey depo., at 67; *see also* Doc. 37, Exhibit D, Cobb depo., at 191), with the remaining time being designated family medical leave and short-term disability (Doc. 31, Exhibit 5, Bailey depo., at 50).

[29]     Mileski's start date for short-term disability was actually June 14, 2013 inasmuch as the short-term disability administrator, Matrix, required all eligible applicants to meet an 80-hour threshold before cutting checks. (*See id.* at 45.) Thomas Hospital's short-term disability plan is "designed to provide a source of income replacement for a specific period of illness or injury for eligible employees[,]" including "[r]egular full-time employees who ha[d] been in an eligible status for at least six months[.]" (Doc. 37, Exhibit 5 to Nelson depo., at Bates No. 000010.)

    Even though plaintiff's short-term disability did not "kick in" until June 14, 2013, she was paid for the two-week period between May 31, 2013 and June 14, 2013 because she utilized her accrued Earned Time Off ("ETO"). (*See* Doc. 37, Exhibit A, Mileski depo., at 69.) As the employee handbook explains: "ETO may be used for holidays, vacation and illness (yours or a family member) or to take care of personal business." (Doc. 37, Exhibit 5 to Nelson depo., at Bates No. 000010.)

[30]     The Employee Assistance Program (EAP) was geared to helping the employees of the Infirmary Health System (and their dependents) with issues that could "affect job performance and/or [their] personal lives." (Doc. 37, Exhibit 5 to Nelson depo., at Bates No. 000010; *compare id. with* Doc. 37, Exhibit D, Cobb depo., at 75 (describing EAP as a benefit offered employees, through counseling services, to help with an array of health and family issues).) An employee could get to the program simply by a reminder from Cobb of the availability of that benefit or via a decision made by Cobb and Stembridge that mandatory EAP was necessary. (*Id.* at 76 & 82.)

4, Nelson depo., at 120 *with* Doc. 37, Exhibit 7 to Nelson depo., Bates No. 000001.) On that form, the HR supervisor, Lisa Cobb, in "marking" the reason for the referral, did not "check" any reason besides "Other," even though the form instructs the person making the referral to "Check all that apply." (*Id.*) The "reasons" not checked by Cobb include "Disregard for the safety of others," and "Insubordination[;]" instead, Cobb checked "Other" and offered the following comments/information regarding Mileski's performance/behavior: "Concern job abandonment. Employee refused assignment, left building. Later called implying she was going to do something more drastic. Company concern for fit for duty." (*Id.*)[31] Nelson and Cain discussed the form with Mileski on June 10, 2013 and informed her that her participation in EAP was mandatory and a condition of her job (Doc. 31, Exhibit 4, Nelson depo., at 121), as the form itself provides (*see* Doc. 37, Exhibit 7 to Nelson depo., at Bates No. 000001 ("I understand and agree that *as a condition of continued employment*, I will attend an assessment by the IHS Employee Assistance Program. I further understand and agree to abide with any recommendations for treatment, care and/or counseling as given by the EAP. I will complete the course of treatment as recommended or arranged through the EAP and cooperate with any such treatment, counseling or care. I understand and agree that failure to abide by the treatment plan or other recommendations of EAP may be grounds for immediate termination. My signature below indicates my acceptance of these terms and authorizes my employer and Phases EAP to exchange information regarding this referral." (emphasis supplied)), but did not otherwise inform plaintiff that she was going to be terminated for job abandonment at the conclusion of her EAP referral (*compare* Doc. 37,

---

[31]     Karen Arnold was sent a copy of the referral form. (*See id.*)

Exhibit B, Nelson depo., at 121-122 *with* Doc. 37, Exhibit C, Cain depo., at 52 (plaintiff was not told that the decision to fire her had already been made because they wanted her to use her benefits to get the help she needed) & Doc. 31, Exhibit 3, Cain depo., at 56 (Cain's testimony that they were going to wait and see whether plaintiff would be cleared through EAP to come back to work but insists that even if she was cleared they were not going to reconsider the situation and were going to terminate plaintiff)). At that meeting and in her previous discussions with Cobb and Nelson, Cain was concerned with plaintiff's fitness for duty as set forth in the employee handbook[32]. (*See* Doc. 37, Exhibit C, Cain depo., at 44.) Cain thought the referral to EAP was appropriate in light of her concern with whether plaintiff was mentally (that is, whether she was in the proper frame of mind) and physically capable of performing the essential functions of her job. (*See id.*, at 45-49.) Interestingly, Cobb apparently did not share this concern and testified that she made the "fit for duty" notation on the referral form because she believed that was required in order to refer an employee for mandatory EAP (*compare* Doc. 37, Exhibit

---

[32]     That portion of the employee handbook reads, in relevant part, as follows:

> A critical element in providing [a safe] environment [for patients, visitors, medical staff and employees] is the ability of employees to perform the essential functions of their positions at all times. Reasonable accommodations may be made in accordance with administrative guidelines maintained to assure compliance with the Americans with Disabilities Act of 1990 (ADA). Any employee who is suspected of being unable to perform the essential functions of their positions will be required to cooperate with any means of investigation (including medical, physical, mental, drug or other assessments as required) to verify fitness for duty.

> Employees requesting accommodations should present those in writing to the Employee Health Department.

> Any employee who has been away from work while under the care of a physician may be required to submit a physician's authorization to return to work and/or report to the Employee Health Department so that fitness for duty can be determined.

(Doc. 37, Exhibit 5 to Nelson depo., at Bates Nos. 000018-000019.)

D, Cobb depo., at 125 ("That's just a term we typically use in referral for EAP.") and *id.* at 127 (it was protocol, routine, and what was typically done for a referral to mandatory EAP, and she thought she had to put it on the form to obtain an EAP referral) *with* Doc. 31, Exhibit 2, Cobb depo., at 129 (Cobb did not want EAP to decide whether plaintiff was fit for duty but, instead, wanted her to get help for what happened at the pier)); however, it is clear that there was no requirement that a reference to whether an employee was "fit for duty" necessarily had to appear on a referral form in order for EAP services to be provided (Doc. 31, Exhibit 7, Roldan depo., at 26-27). When a concern over "fit for duty" is contained on an EAP referral form, Roldan assumes she is being asked for a fit-for-duty assessment. (*Id.* at 27; *see also id.* at 26 ("When they ask for a fit for duty, typically they want me to contact physicians, treatment providers, or actually make referrals to physicians or accessors that can determine if a professional is cognitively and emotionally ready to provide are for patients."); *compare id. with* Doc. 37, Exhibit J ("[E]mployer wants evaluation & clearance by EAP prior to return to work.").)

Based upon receipt and execution of the EAP referral form, Mileski was aware that she needed to schedule an appointment with Helena Roldan. (*See* Doc. 37, Exhibit A, Mileski depo., at 64; *cf. id.* at 63 (Nelson told her on June 7, 2013, that Cobb wanted plaintiff to see Roldan).) Plaintiff's first meeting with Roldan occurred on June 21, 2013. (Doc. 31, Exhibit 7, Roldan depo., at 19.) Prior to that meeting, Mileski's therapist, Susie Carpenter, suggested that Roldan was probably going to want plaintiff to enroll in The Harbor program, so plaintiff enrolled in that program and completed the paperwork for family medical leave and short-term disability. (*See* Doc. 37, Exhibit A, Mileski depo., at 65-66.) When plaintiff met with Roldan on June 21, 2013, and informed her that she was already being treated for depression at The Harbor, Roldan simply let Mileski stay at The Harbor for treatment. (Doc. 31, Exhibit 7, Roldan depo., at 19-20.)

As aforesaid, Mileski was granted family medical leave for the time off, save for the first hour of her May 31, 2013 shift[33] (and, as well, was paid for the time off because of her accrual of EOT and her approval for short-term disability). The hospital's policy respecting family medical leave and the FMLA reads, in relevant part, as follows:

> In accordance with the Family and Medical Leave Act (FMLA), eligible employees are allowed up to 12 weeks of unpaid leave during a rolling 12-month period.
>
> .      .      .
>
> FMLA leave may be granted to eligible employees for:
>
> 1. the birth and care of the employee's newborn child
> 2. the care of the employee's newborn child after birth
> 3. the placement of a child with an employee for adoption or foster care
> 4. the care of the employee's spouse, son, daughter, or parent who has a "serious health condition," or
> 5. a "serious health condition" that makes the employee unable to work (because of a serious health condition).
>
> .      .      .
>
> You are required to provide advance notice of 30 days for leave of absence requests in cases of foreseeable need, and notice "as soon as practicable" in cases of unforeseeable need. Leave of Absence request forms are provided in all affiliate location Human Resources Departments.
>
> .      .      .
>
> In most cases, if you are ready to return to work from an approved FMLA leave, you will be restored to either your original job or to a position of equal responsibility, pay and benefits.

(Doc. 37, Exhibit 5 to Nelson depo., at Bates Nos. 000012-000013.)  It is clear, based on this policy, Cobb's ultimate admission, and other evidence in the record, that plaintiff was granted FMLA leave based upon her treatment for a serious medical condition

---

[33]     Again, Mileski was paid for one hour of work on May 31, 2013. (Doc. 31, Exhibit 2, Cobb depo., at 191.)

(depression) that made her unable to work. (*Compare id.* at Bates No. 000012 *with* Doc. 37, Exhibit D, Cobb depo., at 94-95 (Cobb admitted that the only one of the five definitions Mileski could fall under was that she was taking—and qualified for—FMLA leave for herself for treatment of a serious health condition but she did not know the exact nature of that condition) & 116 (Cobb knew that since plaintiff was out on FMLA leave for her own serious medical condition she had to fall under some portion of the FMLA definition contained in the handbook)[34]; Doc. 37, Exhibit 7 to Cobb depo., at Bates No. 00007 (leave of absence form completed by Mileski on June 13, 2013 reflected that she was requesting FMLA leave for herself); and Doc. 31, Exhibit 7, Roldan depo., at 20 & 28-29 (plaintiff told her during their first meeting on June 21, 2013 that she had struggled with depression since the age of 12 and that it got worse beginning in the fall of 2012 and she could not dig herself out and, therefore, attempted suicide on May 31, 2013; when someone is suicidal, the first step Roldan takes on a referral is to pair that person with a therapist and since plaintiff was already engaged with The Harbor, Roldan allowed her to continue with that treatment).)[35] Although all full-time employees are entitled to 12 weeks (that is, 432 hours since full-time employees worked 36 hours per week) of FMLA leave each year (*compare* Doc. 37, Exhibit D, Cobb depo., at 82-83 *with* Doc. 37, Exhibit F, Bailey depo., at 28-29)), and Bailey initially informed Cobb and Nelson, on June 14, 2014, that plaintiff had 324 hours of FMLA leave available for her use (*see id.,* at 47), she later incorrectly informed Cobb that Mileski's FMLA leave expired on July 7, 2013 and

---

[34]     Cobb was responsible for Thomas Hospital's personnel and HR matters (Doc. 37, Exhibit D, Cobb depo., at 31-32), including EAP referrals, FMLA leave, and short-term disability (*see id.* at 76, 82-83 & 87).

[35]     Cain was also cognizant that plaintiff was on FMLA leave. (Doc. 37, Exhibit C, Cain depo., at 79.)

incorrectly penned a letter for Cobb's signature advising plaintiff that her FMLA leave had expired as of July 7, 2013[36] (*compare* Doc. 31, Exhibit 5, Bailey depo., at 51-56 *with* Doc. 37, Exhibit A, Mileski depo., at 70-71 (she received a letter from Cobb dated July 16, 2013 advising that her FMLA leave hours expired on July 7, 2013)).[37]

After five or six weeks of treatment under the care of Dr. Stephen Lyrene, Mileski was discharged from The Harbor Intensive Outpatient Program on or about July 18, 2013. (*Compare* Doc. 37, Exhibit I (showing a discharge date of July 18, 2013) *with* Doc. 37, Exhibit 8 to Nelson depo., at Bates No. 001072 (Dr. Lyrene signed a release slip on July 17, 2013, advising that Mileski could return to work on July 22, 2013).) Susie Carpenter's letter dated July 22, 2013, which was penned to plaintiff's treating physician, included discharge instructions that plaintiff was to follow-up with her for individual counseling and with Alabama Psychiatric Services for medication management. (Doc. 37, Exhibit I.) The Harbor scheduled an appointment for Mileski to see Roldan on July 19, 2013; Roldan seconded plaintiff's return to work and plaintiff agreed to follow-up with Carpenter and Dr. Robertson at Alabama Psychiatric. (Doc. 31, Exhibit 7, Roldan depo., at 21-22.) Roldan did not place any restrictions on plaintiff's return to work. (*Id.* at 22.)

[36]    As a result of Bailey entering incorrect information into the defendant's computer system, plaintiff was improperly shown as being on a non-FMLA leave of absence with short-term disability pay. (*See* Doc. 31, Exhibit 5, Bailey depo., at 50-51.)

[37]    Based on the substance of Bailey's testimony, Mileski's FMLA leave obviously would not have expired until a date after her termination on July 24, 2013 (Doc. 31, Exhibit 5, Bailey depo., at 51-56) and, therefore, her job protection never stopped (*cf.* Doc. 57, Exhibit A, Mileski depo., at 71 (plaintiff's testimony that she was unaware that her job protection stopped when her FMLA leave expired)). It is also clear, however, that Mileski's job was not posted and, on the date of her termination, the position was still vacant. (Doc. 37, Exhibit D, Cobb depo., at 184.)

Cobb testified that the job abandonment issue was not revisited on July 16, 2013 because the hospital's protocol was to hear from the employee about the incident before reaching a final decision. (Doc. 37, Exhibit D, Cobb depo., at 175-176.)

With respect to job restoration upon return from FMLA leave, the FMLA Appendix to Thomas Hospital's employee handbook provides that "an employee must be restored to the employee's original job, or to an equivalent job with equivalent pay, benefits, and other terms and conditions of employment. An employee's use of FMLA leave cannot result in the loss of any employment benefit that the employee earned or was entitled to before using FMLA leave, nor be counted against the employee under a 'no fault' attendance policy." (Doc. 37, Exhibit 5 to Nelson depo., at Bates No. 000037.)

On or about July 22, 2013, plaintiff called Nelson and informed her that she had been released to return to work (*compare* Doc. 37, Exhibit A, Mileski depo., at 72-73 *with* Doc. 37, Exhibit B, Nelson depo., at 128-129); the nurse manager told plaintiff that although she was ready for her to come back to work (Doc. 37, Exhibit A, Mileski depo., at 73), she needed to speak with HR first (*compare id. with* Doc. 37, Exhibit B, Nelson depo., at 129). Nelson informed Cobb by email that Mileski had been released by EAP and Cobb sent Nelson a return email advising her to give plaintiff her (Cobb's) direct number so that she and Cain could meet with plaintiff. (*See* Doc. 37, Exhibit 6 to Cain depo., Bates Nos. 000028-000029.)[38] Nelson relayed Cobb's direct number to Mileski (*see id.* at Bates No. 000028); Mileski called the HR manager that same day, July 22, 2013, and then met with Cobb and Cain that afternoon (Doc. 37, Exhibit A, Mileski depo., at 73-74).[39]

---

[38]     Cobb was independently aware that EAP had released plaintiff to return to work. (*See* Doc. 37, Exhibit 19 to Cobb depo., Bates No. 000136, Email from Karen Arnold to Lisa Cobb ("Noelle saw Helena on the 19th. She is ok to return to work. She will follow up with Susie Carpenter and Susie will report compliance to Helena going forward.").)

[39]     When Cobb met with plaintiff on July 22, 2013, she was aware that the May 31, 2013 incident resulted in plaintiff's FMLA leave and that Mileski's FMLA leave was retroactively dated to May 31, 2013, after the first hour of plaintiff's May 31, 2013 shift. (Doc. 31, Exhibit 2, Cobb depo., at 190-191.)

Before meeting with Mileski, the decision had been made to terminate plaintiff according to Cain (Doc. 31, Exhibit 3, Cain depo., at 82); however, Cain and Cobb heard plaintiff's "side of the story" to be fair and because "they" always retain the right change a decision based upon information not available to them during the investigation (*id.* at 82-83). Nevertheless, Cain heard nothing in the meeting to change her mind (re: termination), does not know if plaintiff could have done anything to change her mind (*id.* at 84), and had no explanation for why Cobb asked plaintiff why she should be allowed to return to work in light of the decision to terminate plaintiff (*see* Doc. 37, Exhibit C, Cain depo., at 89). As reflected in the deposition testimony of Cobb and Cain, as well as Cobb's handwritten notes of the meeting, which were later "typed up," plaintiff told the HR manager and nursing director a number of things about the May 31, 2013, and otherwise (*compare* Doc. 37, Exhibit 7 to Cain depo. & Doc. 31, Exhibit 14 to Cobb depo. *with* Doc. 37, Exhibit D, Cobb depo., at 194-195 & 197; Doc. 31, Exhibit 2, Cobb depo., at 198-199 & Doc. 37, Exhibit C, Cain depo., at 89-90); however, it is clear that Cobb did not write down verbatim each and every word that was exchanged during that meeting (Doc. 37, Exhibit D, Cobb depo., at 194) and did not have plaintiff look through her handwritten (or the later typewritten) notes to check for accuracy (Doc. 31, Exhibit 2, Cobb depo., at 191-192).  Therefore, for instance, while it is clear that plaintiff told Cain and Cobb that she had a history of depression that had worsened because of dealing with the loss of her mother, a new child, and a custody dispute with her ex-husband involving her oldest child (who has a chronic illness), the latter spilling over into a fight with her ex-husband the night before her morning shift on May 31, 2013 (*compare* Doc. 37, Exhibit C, Cain depo., at 89-90 *with* Exhibit 7 to Cain depo.), Cobb insists that she correctly reflected in her handwritten notes that what caused plaintiff to become upset and leave the hospital on May 31, 2013 was seeing the floating assignment

on the staffing book (*see* Doc. 31, Exhibit 2, Cobb depo., at 198). It is clear to the undersigned, however, as previously indicated, that Mileski was upset before she set foot on hospital property and at some point following her arrival on the MICU and looking at the assignment book, she could cope no longer and "just went away somewhere" and "'was not in [the] frame of mind'" to tell Nelson (or anyone else) that she was leaving the hospital[40].  (*See* Doc. 37, Exhibit 7 to Cain depo., at Bates No. 000060.)

During this meeting, plaintiff was also asked why she should be allowed to keep her job, to which she responded that she liked her job, she was good at it, she had never been in any trouble or counseled for anything, she had a good working relationship with her coworkers, and that she was liked by her patients. (Doc. 37, Exhibit A, Mileski depo., at 74; *compare id. with* Doc. 37, Exhibit 7 to Cain depo.) According to Mileski, she did not tell Cain and Cobb that she was willing to accept punishment because what she did was wrong and cannot recall whether she told the pair that she was anxious about returning to work. (Doc. 37, Exhibit A, Mileski depo., at 75; *compare id. with* Doc. 37, Exhibit 7 to Cain depo.) What all three agree upon is that Mileski was told that Cobb and Cain would talk and get back to her later in the week. (*Compare* Doc. 37, Exhibit A, Mileski depo., at 75 *with* Doc. 37, Exhibit C, Cain depo., at 91-92 & Exhibit 7 to Cain depo.)

Immediately after the meeting, Cain and Cobb discussed the matter and basically determined that the issue was plaintiff's job abandonment and she should be terminated. (Doc. 37, Exhibit C, Cain depo., at 92.) Cobb also spoke with Stembridge at 2:49 p.m. on July 22, 2013, and he recommended that plaintiff not be allowed to return to work.

---

[40]    Cobb's sole focus was on plaintiff's alleged statement to her that on the date in question she saw her floating assignment, got upset, and left the hospital, actions which Cobb considered to be job abandonment. (Doc. 37, Exhibit D, Cobb depo., at 197 ("When she told me she saw the assignment on the staffing book and she got upset and left, to me, that defined job abandonment.").)

(*Compare* Doc. 31, Exhibit 2, Cobb depo., at 200 *with* Doc. 37, Exhibit 7 to Cain depo., at Bates No. 000061.) According to Cobb, the final decision was made by Bill McLaughlin and Cain; she and Stembridge recommended termination for job abandonment and McLaughlin and Cain concurred in that recommendation and determined that plaintiff was to be terminated per hospital policy for job abandonment. (*See* Doc. 31, Exhibit 2, Cobb depo., at 200-204; Doc. 37, Exhibit C, Cain depo., at 86.) Cobb and Cain then met with Mileski again on July 24, 2013 and informed her that she was being terminated and would not be allowed to return to work because she had abandoned her job on May 31, 2013[41]. (*Compare* Doc. 37, Exhibit A, Mileski depo., at 75-76 *with* Doc. 37, Exhibit C, Cain depo., at 93-94 & Exhibit 8 to Cain depo., at Bates No. 000059.)[42] At the time this decision was made, there were no concerns about plaintiff's abilities to perform the essential functions of her job. (Doc. 37, Exhibit C, Cain depo., at 59.) Even though there were no concerns in this regard, Cain was certainly concerned about the future possibility of plaintiff mentally abandoning her job, as captured in the following July 24, 2013 handwritten notes of Cobb: "Georgie Cain concerned that she works in critical care area. To abandon job puts patients as risk—miss a critical order or comm. to RN or physician—failed to note critical observation or initials in chart." (*See* Doc. 37, Exhibit 8 to Cain depo., Bates No. 000059.) That these captured observations of Cain were forward-looking is clear because the evidence before Cobb and Cain did not establish

---

[41]    To plaintiff, this meant that she left work without permission. (Doc. 37, Exhibit A, Mileski depo., at 76.)

[42]    Cain admitted that Mileski expressed her disappointment with the decision and told them (that is, Cain and Cobb) the reasons she should be allowed to return to work and that they should have spoken to Nelson and her team leader regarding the nature of her depression. (*See* Doc. 37, Exhibit C, Cain depo., at 95.) According to Cain, the reasons Mileski proffered for returning to her job had nothing to do with the basis for termination, that is, job abandonment. (*Id.*)

that any patients were detrimentally impacted on account of plaintiff not reporting to the cardiac unit on May 31, 2013 (*see, e.g.*, Doc. 31, Exhibit 3, Cain depo., at 109).

In addition to the foregoing, on July 24, 2013,[43] when Cobb was recommending that plaintiff be terminated for leaving the job, she was fully cognizant that the time period for which plaintiff was gone from work on May 31, 2013—after the first hour of that day—was later approved as FMLA leave. (Doc. 37, Exhibit D, Cobb depo., at 204-206; *see also id.* at 219 (Stembridge was also aware that plaintiff was approved for FMLA leave on May 31, 2013); *cf. id.* at 237-238 (Stembridge was as aware as she was when recommending termination that plaintiff had been on short-term disability but denied discussing her short-term disability status when trying to determine whether to let her go).)[44]

While Cobb admitted that plaintiff leaving without authorized approval on May 31, 2013 was an example of an unscheduled absence/occurrence under the defendant's time and attendance policy (Doc. 37, Exhibit D, Cobb depo., at 114-115; *see also* Doc. 31, Exhibit 2, Cobb depo., at 211),[45] which is clearly defined in the employee handbook,[46] she

---

[43]     On the Personnel Action Request, which Cobb signed on July 25, 2013, the termination code entered for job abandonment—123—reflects that plaintiff was not eligible for rehire (Doc. 37, Exhibit 20 to Cobb depo.; *see also* Doc. 31, Exhibit 2, Cobb depo., at 230-231), though Cobb's notes of the meeting with plaintiff on July 24, 2013 reflect that the human resources manager thought Mileski could be considered for employment in the future (*compare* Doc. 37, Exhibit 8 to Cain depo., Bates No. 000059 *with* Doc. 37, Exhibit C, Cain depo., at 95-96).

[44]     Cobb fully appreciates that an employer cannot terminate, or otherwise discriminate against, an employee for taking FMLA leave. (Doc. 37, Exhibit D, Cobb depo., at 204.)

[45]     Cobb testified that had plaintiff told her supervisor on May 31, 2013 that she was ill and left that would be an unscheduled absence, and it also would have been an unscheduled absence if plaintiff clocked in, got her assignment, told her supervisor she was ill, and then left after clocking out. (Doc. 37, Exhibit D, Cobb depo., at 212 & 215.) Cobb also testified that it was her understanding that any absence resulting from a qualified illness covered under the FMLA is (Continued)

was immovable in her position that what plaintiff did on May 31, 2013 (leaving after clocking in and receiving her assignment)[47] constitutes job abandonment for which it has always been Thomas Hospital's consistent policy to terminate employment (*compare* Doc. 131, Exhibit 2, Cobb depo., at 108, 158-159, 198-199 & 209-210 & Doc. 42, Exhibit 2, Cobb

---

not considered an occurrence under the defendant's absence, tardiness and timekeeping policy. (*Id.* at 211-212.)

[46]    The employee handbook contains a description of the Infirmary Health System's Attendance Policy, which reads, in relevant part, as follows:

Infirmary Health System follows an occurrence-based policy for tardiness and unscheduled absences. An "occurrence" could be any:

1.  unscheduled absence

2.  instance of tardiness

3.  instance of leaving without authorized approval, or

4.  instance of a missed time-card punch

The following schedule of occurrences (tracked on a rolling 12-month period) and corrective action will be followed:

| Number of Occurrences | Corrective Action |
| --- | --- |
| 4 | Verbal warning |
| 6 | Written Warning |
| 8 | Final written warning |
| 10 | Suspension/Termination |

Employees who fail to follow proper procedures (call-in notification/guidelines) or who are found to have unacceptable patterns of tardiness or absenteeism will be subject to corrective action up to and including termination.

(Doc. 37, Exhibit 5 to Nelson depo., at Bates No. 000026.) As reflected above, and as admitted by Cobb, leaving work early without authorized approval is considered an "occurrence" under Thomas Hospital's attendance policy. (Doc. 31, Exhibit 2, Cobb depo., at 110 & 115.)

[47]    "[S]he told me she saw her assignment and was upset and left. She made the choice of leaving after she saw her assignment." (Doc. 37, Exhibit D, Cobb depo., at 217.)

depo., at 111-112 *with* Doc. 31, Exhibit 8, Affidavit of Lisa Cobb, at ¶ 2 ("It has consistently been the practice at Thomas Hospital to terminate employees for job abandonment in the context of leaving their assigned duties at the hospital without permission, without notifying anyone and/or without clocking out. Thomas considers this patient abandonment and a gross violation of hospital policy. Similarly, Thomas has consistently terminated employees who appear for work and refuse to perform assignments alternate to their regular assignments.")[48]),  even though job abandonment is nowhere defined in the employee handbook or listed as a terminable offense (*see* Doc. 37, Exhibit 5 to Nelson depo., at Bates No. 000025). According to Cobb, even though Thomas Hospital does not meet with employees and tell them where job abandonment falls under its termination policy (Doc. 37, Exhibit D, Cobb depo., at 109), any employee reading page 25 of the handbook would appreciate that job abandonment would fall under one of three categories, namely, insubordination, refusal to perform assigned duties, or an action that could result in imminent or substantial danger to the life, health, or property of employees, patients or other customers (Doc. 31, Exhibit 2, Cobb depo., at 108 & 209-210).

INVOLUNTARY TERMINATION

.     .     .

---

[48]     The remainder of Cobb's affidavit reads, as follows: "In reviewing available information, I have discerned that, in the last five years, Thomas has terminated at least five people, in addition to Noelle Mileski, for this type of work violation. One was terminated for leaving her shift without permission or notice and without clocking out to perform a personal errand at her home. One was terminated when he walked off the job mid-shift because he was upset with his supervisor's decision. Another was terminated when she had permission to leave for two hours but failed to return at the appointed time and did not return telephone calls looking for her. Two other employees were terminated for refusing to accept assignments to float from their regular unit to another unit. [] I am not aware of any situation where an employee walked off the job at Thomas without permission and was not terminated." (*Id.* at ¶¶ 3-4.)

**.**      Violations: Infirmary Health System reserves the right to immediately discharge (without notice or pay in lieu of notice) any employee who is considered to be in gross violation of IHS policies, procedures, or standards of conduct. "Gross violation" includes, but is not limited to, the following:

—Theft/destruction of property
—Violence or other inappropriate behavior (including behavior that could have an adverse effect on the community's confidence in or perception of the System)
—Insubordination or refusal to perform assigned duties
—Exhibiting behavior contrary to the mission and values
—Any action[] that could result in imminent or substantial danger to life, health, or property of any employees, patients, or other customers.

(Doc. 37, Exhibit 5 to Nelson depo., at Bates No. 000025.)


## CONCLUSIONS OF LAW

A.      **Summary Judgment Standard.**  Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) ("The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment."); *Garczynski v. Bradshaw*, 573 F.3d 1158, 1165 (11th Cir. 2009) ("[S]ummary judgment is appropriate even if '*some* alleged factual dispute' between the parties remains, so long as there is 'no *genuine* issue of *material* fact.'").

The party seeking summary judgment has the initial responsibility of informing the court of the basis for the motion and of establishing, based upon the discovery instruments outlined in Rule 56(c), that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *see also Allen v. Board of Public*

*Educ. for Bibb County*, 495 F.3d 1306, 1313 (11th Cir. 2007) ("The moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial."). Once this initial demonstration is made, the "responsibility then devolves upon the non-movant[s] to show the existence of a genuine issue . . . [of] material fact." *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1116 (11th Cir. 1993); *see also Allen*, supra, at 1314 ("'When a moving party has discharged its burden, the non-moving party must then "go beyond the pleadings," and show by its own affidavits, or by "depositions, answers to interrogatories, and admissions on file," designate specific facts showing that there is a genuine issue for trial.'"); *see Comer v. City of Palm Bay, Florida*, 265 F.3d 1186, 1192 (11th Cir. 2001) ("Once the moving party discharges its initial burden of showing that there is an absence of evidence to support the non-moving party's case, the non-moving party must specify facts proving the existence of a genuine issue of material fact for trial confirmed by affidavits, '"depositions, answers to interrogatories, and admissions on file."'").

> Forbidding reliance upon pleadings precludes a party from "choos[ing] to wait until trial to develop claims or defenses relevant to the summary judgment motion." . . . This effectuates the purpose of summary judgment which "'is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" . . . Thus, "mere general allegations which do not reveal detailed and precise facts" will not prevent the award of summary judgment upon a court's determination that no genuine issue for trial exists.

*Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 592 (11th Cir.), *cert. denied sub nom. Jones v. Resolution Trust Corp.*, 516 U.S. 817, 116 S.Ct. 74, 133 L.Ed.2d 33 (1995); *see also LaChance v. Duffy's Draft House, Inc.*, 146 F.3d 832, 835 (11th Cir. 1998) ("[The nonmoving party] must raise 'significant probative evidence' that would be sufficient for a jury to find for that party."). In other words, there is no genuine issue for trial "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving

28

party[.]" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *see Comer, supra*, 265 F.3d at 1192 ("Summary judgment is required where the non-moving party's response to a motion is merely 'a repetition of his conclusional allegations' and is unsupported by evidence showing an issue for trial.").

In considering whether the plaintiff is entitled to summary judgment in this case, the Court has viewed the facts in the light most favorable to the plaintiff. *Comer, supra*, 265 F.3d at 1192 ("We view the evidence and all factual inferences raised by it in the light most favorable to the non-moving party, and resolve all reasonable doubts about the facts in favor of the non-moving party.").

> The requirement to view the facts in the nonmoving party's favor extends only to "genuine" disputes over material facts. A genuine dispute requires more than "some metaphysical doubt as to the material facts." A "mere scintilla" of evidence is insufficient; the non-moving party must produce substantial evidence in order to defeat a motion for summary judgment.

*Garczynski, supra*, 573 F.3d at 1165 (internal citations omitted). In addition, "[t]here is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment." *Resolution Trust Corp., supra*, 43 F.3d at 599. Accordingly, the Court limits its review to those arguments expressly advanced by the parties.

**B.     ADA Claim.** In Count I of her complaint, plaintiff alleges that she was subject to discrimination in violation of the Americans with Disabilities Act (Doc. 1, at 8-9). In her brief in opposition to defendant's motion for summary judgment, Mileski has voluntarily dismissed her claim(s) for failure to accommodate under the ADA (*see* Doc. 36, at 15 n.15); therefore, the Court considers plaintiff's remaining claim under the ADA that defendant unlawfully terminated her in violation of the ADA (Doc. 36, at 15-27). As

recognized by the Eleventh Circuit, "[i]n part as a reaction to Supreme Court decisions in cases like *Sutton v. United Air Lines, Inc.,* 527 U.S. 471, 482, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999) (whether an individual is disabled must be determined with reference to corrective measures), and *Toyota Motor Mfg., Ky., Inc. v. Williams,* 534 U.S. 184, 196-97, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002) (interpreting the phrase 'substantially limits' to mean limiting to a considerable or large degree, and the phrase 'major life activities' to mean activities that are of central importance to daily life), Congress made significant changes to the ADA by enacting the ADA Amendments Act of 2008 [], Pub. L. No. 110-325, 122 Stat. 3553, which became effective on January 1, 2009." *Mazzeo v. Color Resolutions Int'l, LLC,* 746 F.3d 1264, 1267 (11th Cir. 2014). The general effect of the changes wrought by the Amendments Act was to "broaden the ADA's coverage[,]" *Moore v. Jackson County Bd. of Educ.,* 979 F.Supp.2d 1251, 1259 (N.D. Ala. 2013) (citations omitted), by, among other things, promulgating "a more liberal standard of the term 'disabled,' [thereby] making it significantly easier for a plaintiff to show disability." *Barlow v. Walgreen Co.,* 2012 WL 868807, *4 (M.D. Fla. Mar. 14, 2012); *see also Mazzeo, supra,* 746 F.3d at 1268 ("When it enacted the ADAAA, Congress indicated that one of its purposes was to 'convey that the question of whether an individual's impairment is a disability under the ADA should not demand extensive analysis.' 42 U.S.C. § 12101 note."); 29 C.F.R. § 1630.1(c)(4) ("The primary purpose of the ADAAA is to make it easier for people with disabilities to obtain protection under the ADA."). And though this Court must certainly apply the post-ADAAA version of the ADA to Mileski's ADA claim, since the critical events in this case all took place after the ADAAA went into effect, *Mazzeo, supra*, 746 F.3d at 1267-1268, it bears noting that the general analytical framework remains consistent, *Beatty v. Hudco Indus. Prods., Inc.,* 881 F.Supp.2d 1344, 1351 (N.D. Ala. 2012) ("Despite the changes brought about by the ADAAA, courts still

utilize the same McDonnell Douglas burden-shifting analysis used in ADA and Title VII

cases.").

> "The ADA prohibits an employer from discriminating against a
> 'qualified individual on the basis of disability.'" *McCarroll v. Somerby of
> Mobile, LLC,* No. 14-11040, 2014 U.S. App. LEXIS 23356, at *4, 2014 WL
> 6996300 (11th Cir. Dec. 12, 2014) (quoting 42 U.S.C. § 12112(a)). "In the
> absence of direct evidence of discrimination, a plaintiff may establish a
> prima facie case of an ADA violation through circumstantial evidence
> using the familiar burden-shifting analysis employed in Title VII
> employment discrimination cases." *Wascura v. City of S. Miami,* 257 F.3d
> 1238, 1242 (11th Cir. 2001). In order to establish a *prima facie* case, the
> plaintiff must satisfy the following elements: (1) that he has a disability
> within the meaning of the ADAAA; (2) that he is qualified to perform the
> job, i.e., that with or without reasonable accommodations, he can perform
> the essential functions of his job; and (3) that he was discriminated against
> because of his disability. . . . "If the plaintiff meets his prima facie burden,
> and the defendant presents a legitimate, nondiscriminatory reason for its
> actions, the plaintiff may then demonstrate that that reason given was a
> pretext for disability discrimination." *Ward v. UPS,* 580 Fed.Appx. 735, 740
> (11th Cir. 2014) (unpublished decision).

*Puckett v. Board of Trustees of the First Baptist Church of Gainesville, Inc.,* 2015 WL 690104,

*7 (N.D. Ga. Feb. 18, 2015) (footnote omitted); *compare id. with Mazzeo, supra,* 746 F.3d at

1267-1268 ("The ADA prohibits discrimination by an employer 'against a qualified

individual on the basis of a disability' in any of the 'terms, conditions, [or] privileges of

employment.' 42 U.S.C. § 12112(a). A 'qualified individual' is 'an individual who, with

or without reasonable accommodation, can perform the essential functions of the

employment position that such individual holds or desires.' *Id.* at § 12111(8). To

establish a *prima facie* case of employment discrimination under the ADA, a plaintiff

must show that, at the time of the adverse employment action, he had a disability, he

was a qualified individual, and he was subjected to unlawful discrimination because of

his disability.") and *Ward v. United Parcel Serv.,* 580 Fed.Appx. 735, 739-740 (11th Cir.

Sept. 11, 2014) ("The ADA holds that '[n]o covered entity shall discriminate against a

qualified individual on the basis of disability in regard to job application procedures,

the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.' We analyze ADA discrimination claims under the *McDonnell Douglas* burden-shifting framework. To establish a prima facie case, a plaintiff may show that (1) he was disabled, (2) he was qualified to perform the job, and (3) he was subjected to an adverse employment action because of his disability. If the plaintiff meets his prima facie burden, and the defendant presents a legitimate, non-discriminatory reason for its actions, the plaintiff may then demonstrate that the reason given was a pretext for disability discrimination." (internal citations omitted)).

    **1.**    __Was Mileski Disabled?__  "The ADA defines the term 'disability' as (1) a physical or mental impairment that 'substantially limits one or more' of an individual's 'major life activities,' (2) a 'record of such an impairment,' or (3) 'being regarded as having such an impairment' as described in subsection (1)." *Mazzeo, supra,* 746 F.3d at 1268, citing 42 U.S.C. § 12102(1). The defendant argues that plaintiff cannot establish a covered disability (Doc. 33, at 9-12), to which Mileski demurs in contending "she has actual mental disabilities, has a record of such impairment, and was regarded as disabled by her employer." (Doc. 36, at 18; *see also id.* at 18-22.)

    **a.**    Turning to the first prong, this Court considers whether Mileski had a mental impairment that substantially limited one of more of her major life activities.[49]

---

[49]    With respect to whether an individual has a record of a disability, this prong is met if the individual "has a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities." 29 C.F.R. § 1630.2(k)(1).

> Whether an individual has a record of an impairment that substantially limited a major life activity shall be construed broadly to the maximum extent permitted by the ADA and should not demand extensive analysis. An individual will be considered to have a record of a disability if the individual has a history of an impairment that substantially limited one or more major life activities when

(Continued)

Under the ADA, "major life activities include, bit are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A); *see also* 29 C.F.R. § 1630.2(i)(1)(i) (adding to the list, "interacting with others"). As for "substantially limited," *Mazzeo* is instructive:

> [I]n passing the ADAAA, Congress stated that the Supreme Court's interpretation of the phrase "substantially limits," in cases like *Toyota Motor*, had "created an inappropriately high level of limitation necessary to obtain coverage under the ADA," and that "the primary object of attention in cases brought under the ADA should be whether entities covered by the ADA have complied with their obligations[.]" 42 U.S.C. § 12101 note. The ADA, therefore, now provides that the phrase "substantially limits" "shall be interpreted consistently with the findings and purposes of the [ADAAA]," *id.* at § 12102(4)(B), and that "an impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active," *id.* at § 12102(4)(D). And the EEOC, pursuant to its statutory authority to issue regulations implementing the definition of "disability" in the ADA, *see id.* at § 12205a, has further explained that the phrase "substantially limits" is to be "construed broadly in terms of extensive coverage" and is "not meant to be a demanding standard." 29 C.F.R. § 1630.2(j)(1)(i). The EEOC's regulations also provide that an "impairment need not prevent, or significantly or severely restrict, the individual from performing a major

---

compared to most people in the general population, or was misclassified as having had such an impairment. In determining whether an impairment substantially limited a major life activity, the principles articulated in paragraph (j) of this section apply.

29 C.F.R. § 1630.2(k)(2). Importantly, "substantially limits" is not a demanding standard, and an impairment is a disability "if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population[]" but the impairment "need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting[;]" "[t]he comparison of an individual's performance of a major life activity to the performance of the same major life activity by most people in the general population usually will not require scientific, medical, or statistical analysis[;]" "[t]he determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures[;]" and "[a]n impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active." 29 C.F.R. § 1630.2(j)(ii), (v), (vi) & (vii).

life activity in order to be considered substantially limiting;" the phrase "substantially limits" shall be interpreted and applied to require a degree of functional limitation that is lower than the standard for 'substantially limits' applied prior to the ADAAA," (with the exception of glasses or contact lenses) the "determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures;"[50] and an "impairment that is episodic or in remission is a disability if it would substantially limit a major life activity [when active]." *Id.* at § 1630.2(j)(1)(ii), (iv), (vi)-(vii).

746 F.3d at 1269 (footnote added).

There can be little question but that depression and PTSD—impairments that plaintiff was suffering from and being treated for at the time of her termination—are mental impairments under the ADA. *See Pritchard v. Southern Company Services,* 92 F.3d 1130, 1132 (11th Cir.) ("Depression has been held to constitute a mental impairment."), *amended in part on other grounds,* 102 F.3d 1118 (11th Cir. 1996), *cert. denied,* 520 U.S. 1274, 117 S.Ct. 2453, 138 L.Ed.2d 211 (1997); *Forbes v. St. Thomas Univ., Inc.,* 768 F.Supp.2d 1222, 1229 (S.D. Fla. 2010) (PTSD is a mental impairment). The question thus becomes whether Mileski's depression and/or PTSD substantially limited a major life activity when active.

Mileski testified that she has experienced bouts of depression since she was 12 or 13 years of age and, when active, her depression limits her ability to interact and communicate with others and to care for herself, particularly in light of her numerous suicide attempts (at least 3) the last of which required hospitalization. Based on this evidence, the undersigned need agree with plaintiff that a reasonable juror could find that her depression (which led to a suicide attempt) substantially limited one or more of her major life activities—specifically, caring for herself, *see Peters v. Baldwin Union Free*

---

[50]       "The determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures such as . . . medication[.]" 42 U.S.C. § 12102(4)(E)(i)(I).

*School District*, 320 F.3d 164, 168 (2d Cir. 2003) ("A mental illness that impels one to suicide can be viewed as a paradigmatic instance of inability to care for oneself."), and interacting and communicating with others—and/or that this evidence establishes a record of a disability. This determination is inherently consistent with the more liberal standard of the term "disability" created by the 2008 amendments to the ADA, that is, it serves to underscore the primary purpose of the ADAAA, which was to make it easier for people with disabilities to obtain protection under the ADA. *Cf., e.g., Moore, supra*, 979 F.Supp.2d at 1261 ("The court concludes, in light of the stated purpose of the ADAAA to broaden the coverage of the ADA . . . and especially the definition of the phrase 'substantially limits,' and in consideration of the pervasive regulatory provisions interpreting the ADAAA, that Congress no longer intends for temporary impairments to be excluded from the definition of 'disability.' Plaintiff's ankle injury impairment substantially limited her ability to perform the major life activities of standing, walking, running, and her general musculoskeletal function. The fact that the limitation was temporary is irrelevant.").

**b.** As regards the third prong, plaintiff having essentially combined the first two prongs in arguing that her depression and PTSD are actual disabilities (*see* Doc. 36, at 17-18), "[a]n individual meets the requirement of 'being regarded as having such an impairment' if the individual establishes that . . . she has been subjected to an action prohibited under this chapter because of an actual or perceived . . . mental impairment whether or not the impairment limits or is perceived to limit a major life activity." 42 U.S.C. § 12102(3)(A).

> "In short, to qualify for coverage under the 'regarded as' prong, an individual is not subject to any functional test' and is not required to establish his employer's "beliefs concerning the severity of the impairment." *Interpretive Guidance on Title I of the Americans with Disabilities Act*, 29 C.F.R. App. § 1630.2(l). To defeat summary judgment on

> this element, Plaintiff is "only required to raise a genuine issue of material fact about whether [his employer] regarded him as having a mental or physical impairment." *Hilton v. Wright*, 673 F.3d 120, 129 (2d Cir. 2012).

*Jordan v. City of Union City, Georgia*, 94 F.Supp.3d 1328, 1336 (N.D. Ga. 2015); *see also Dulaney v. Miami-Dade County*, 481 Fed.Appx. 486, 489 n.3 (11th Cir. Jun. 6, 2012) ("[B]eing 'regarded as' having a disability no longer requires a showing that the employer perceived the individual to be substantially limited in a major life activity.").

And while the Court need not expressly determine that the defendant regarded plaintiff as having a mental impairment, given that a decision has been made that plaintiff's mental impairment (depression) substantially limits one or more of her major life activities when active, brief mention is made of this "disability" prong. Before the decision to terminate plaintiff was made on July 24, 2013, the primary decision makers in this case (Cobb and Cain) were cognizant of a number of facts. First, the decision makers were aware that after plaintiff left work on May 31, 2013, she tried to harm herself on by taking pills and, as a result, a course of mandatory EAP was charted as a condition of her job. As part and parcel of mandatory EAP, plaintiff was to undergo a fitness-for-duty evaluation of her condition.[51] Indeed, Cain specifically testified that she was concerned with whether plaintiff could mentally and physically perform the essential functions of her job when the referral to EAP was made and her concern remained on Mileski's termination date. The Court finds that the foregoing evidence raises a genuine issue of material fact about whether the defendant regarded Mileski as having a mental impairment.

---

[51]     Cobb and Cain were aware that plaintiff was granted FMLA leave and short-term disability benefits because of her serious medical condition, that is, depression (and PTSD). That the decision makers may not have been fully cognizant that plaintiff's serious medical condition was depression until July 22, 2013 is of little moment since the decision to terminate Mileski was not made until July 24, 2013.

2.    **Qualified Individual.**  Thomas Hospital makes no argument that Mileski is not a qualified individual (*see* Doc. 33, at 9-14); therefore, the Court moves to the third prong of plaintiff's *prima facie* showing inasmuch as "the onus is upon the parties [in this instance, the defendant] to formulate arguments." *Resolution Trust Corp. v. Dunmar Corp.,* 43 F.3d 587, 599 (11th Cir. 1995); *see also id.* ("There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment.").

3.    **Was Mileski Terminated Because of a Disability.**  The third element of a *prima facie* case of an ADA violation that plaintiff must establish is that she was terminated because of her disability, *see Mazzeo, supra,* 746 F.3d at 1268, a showing that must be made by a preponderance of the evidence, *see Farley v. Nationwide Mut. Ins. Co.,* 197 F.3d 1322, 1334 (11th Cir. 1999).

> [T]he ADA's "because of" causation language is defined as "a factor that *made a difference in the outcome*." In explaining this standard, we explicitly rejected a reading of the ADA's "because of" language that would require plaintiffs to demonstrate that they were discriminated against *solely* because of their disability. In so doing, we observed that the statute "merely imposes a '*but for*' liability standard." Therefore, we simply require that a disability be shown to be a determinative, rather than the sole, decision-making factor.

*Id.* (internal citations omitted; emphasis in original); *see also McNely v. Ocala Star-Banner Corp.,* 99 F.3d 1068, 1077 (11th Cir. 1996) ("'[B]ecause of' conveys the idea of a factor that made a difference in the outcome. The ADA imposes a 'but-for' liability standard.").

Thomas Hospital contends that Mileski has presented no evidence that it terminated her for any reason other than her job abandonment, that is, her act of failing to show up for her job assignment on May 31, 2013, after clocking in and without clocking out and leaving without authorized approval. The defendant continues its argument by noting that "'[t]he law is well settled that the ADA is not violated when an

employer discharges an individual based upon the employer's misconduct, even if the misconduct is related to a disability.'" *Ray v. Kroger Co.,* 264 F.Supp.2d 1221, 1228 (S.D. Ga. 2003) (quoting *Jones v. American Postal Workers Union,* 192 F.3d 417, 429 (4th Cir. 1999)), *aff'd,* 90 Fed.Appx. 384 (11th Cir. Dec. 17, 2003); *see also Sper v. Judson Care Center, Inc.,* 29 F.Supp.3d 1102, 1110 (S.D. Ohio 2014) ("So long as the employee's misconduct is related to the performance of her job, an employer may discipline or terminate the employee even if her misconduct was caused by her disability."); *Oliver v. TECO Energy, Inc.,* 2013 WL 6836421, *9 (M.D. Fla. Dec. 26, 2013) (same as *Ray, supra*). The undersigned cannot agree with defendant's argument at this stage in the proceedings and, instead, finds that a reasonable jury could determine that Mileski's disability was a determinative factor in her termination.

The defendant contends that it terminated plaintiff solely based on her job abandonment and while it is clear that "job abandonment" does "pop up" as a termination code in the defendant's computer system, that term is nowhere defined—nor, indeed, does it appear—in the defendant's handbook/policies as a terminable offense. And while the defendant (through Cobb) contends that any reasonable person in plaintiff's shoes would recognize that what she did on May 31, 2013—clocking in and seeing her assignment but then leaving hospital premises without the permission of a supervisor or clocking out—would constitute "job abandonment" and "fall" within one of the categories of terminable offenses listed in its termination policy—that is, insubordination, refusal to perform assigned duties, or an action that could result in imminent or substantial danger to the life, health, or property of employees, patients, or other customers—this position is questionable not only in light of plaintiff's testimony regarding the meaning of "job abandonment" (*see* Doc. 37, Exhibit A, Mileski depo., at 76 (plaintiff's testimony that when Cobb and Cain told her she was being terminated for

abandoning her job on May 31, 2013, this meant, to her, that she left work without permission)) but, more importantly, because when the decision was made to refer plaintiff to mandatory EAP, as opposed to immediately terminating her for job abandonment, Cobb did not "check" on the referral form any of the terminable offenses Cobb testified about during her deposition even though they were on the form—as "Insubordination" and "Disregard for the Safety of Others"—even though she was instructed to "Check all that apply." Moreover, by defendant's own admissions, it made an "exception" to what it described as its policy of immediately terminating employees for job abandonment[52] by, instead, requiring mandatory EAP and allowing plaintiff to avail herself of her employee benefits by taking FMLA leave and short-term disability retroactive to basically 8:00 a.m. (or 7:44 a.m.) on May 31, 2013. By these actions, the defendant "cloaked" plaintiff with the protections of the Family Medical Leave Act for all but one hour on that crucial day of May 31, 2013 and, therefore, effectively was "left" with what to do about the remaining hour for which she was paid, that is, the hour during which she clocked in but then left without permission. And while defendant insists that this case has nothing to do with its time and attendance policy (*see* Doc. 43, at 8), the undersigned cannot agree inasmuch as this case is "all about" the one-hour period of time on May 31, 2013 "reserved" by the defendant based upon Mileski leaving the hospital without clocking out and without authorized approval, an admitted "occurrence" under the defendant's attendance policy. And while this evidence could rise to the simple inference that the defendant improperly terminated plaintiff for an "occurrence" under its attendance policy, there is more here because Cobb's

---

[52]     Because the defendant made an exception in this regard, its citation to all the "other" cases of job abandonment simply offers no help to the Court. In other words, none of those other instances offer proper comparisons because of the exception made by the defendant.

handwritten meeting notes for July 24, 2013—the date Mileski was terminated—capture specific "job abandonment" comments made by Cain. It is fair to say that these comments are couched in terms of "mental" job abandonment as regards direct patient care, something that decidedly did not happen on May 31, 2013. Therefore, the only way to view these comments, on summary judgment, is through the forward-looking eyes of Cain and her expressed concern over plaintiff mentally abandoning that part of her job related to direct patient care in the future by missing "a critical order or comm. to RN or physician—failed to note critical observation or initials in chart." (Doc. 37, Exhibit 8 to Cain depo.) In consideration of all of the foregoing, therefore, the Court finds questionable whether plaintiff was indeed terminated solely for conduct—job abandonment—that is nowhere specifically defined or listed in the defendant's termination policy, as opposed to being terminated because of her disability, particularly in light of Cain's forward-looking comments captured in Cobb's handwritten notes of July 24, 2013, which reflect Cain's concern/fear that Mileski's mental condition could well cause a mental abandonment in the future—if she was allowed to return to her job—in regard to patient care vis-à-vis missing "a critical order or comm. to RN or physician—failed to note critical observation or initials in chart." Stated differently, the undersigned finds that plaintiff has created an issue of fact on whether Thomas Hospital terminated her because of a disability sufficient to satisfy the third element of her *prima facie* case for purposes of summary judgment.

**4.      Has Thomas Hospital Presented a Legitimate, Non-Discriminatory Reason for Plaintiff's Termination?**  After a plaintiff establishes a *prima facie* case of disability discrimination, the burden shifts to the defendant to present "a legitimate, nondiscriminatory reason for its actions[.]" *Ward, supra,* 580 Fed.Appx. at 740.

> To satisfy the burden of production, "[t]he defendant need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff." *Tex. Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 254-55, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). "[T]o satisfy this intermediate burden, the employer need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus." *Id.* at 257, 101 S.Ct. 1089. "This intermediate burden is 'exceedingly light.'" *Holifield v. Reno,* 115 F.3d 1555, 1564 (11th Cir. 1997) (quoting *Turnes v. AmSouth Bank, N.A.,* 36 F.3d 1057, 1061 (11th Cir. 1994)).

*Lloyd v. Housing Authority of the City of Montgomery, Alabama,* 857 F.Supp.2d 1252, 1265-1266 (M.D. Ala. 2012).  Because plaintiff concedes that the defendant has satisfied this exceedingly light burden of production (*see* Doc. 36, at 22-28), the Court simply focuses its attention on whether Mileski has established that the defendant's proffered reason for her termination—job abandonment—is mere pretext for unlawful disability discrimination.

   **5.    Was Mileski's Termination a Pretext for Disability Discrimination?**  In order to establish pretext, a plaintiff must establish that her "'employer's explanation is unworthy of credence.'" *Lloyd, supra,* 857 F.Supp.2d at 1266, quoting *Jackson v. Alabama State Tenure Comm'n,* 405 F.3d 1276, 1289 (11th Cir. 2005) (other citation omitted).[53]

> This requires showing "*both* that the reason was false, *and* that discrimination was the real reason" for the adverse action. *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 512 n.4, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). A plaintiff may show pretext by pointing to "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the employer's proffered reason. *Brooks v. Cnty. Comm'n of Jefferson Cnty.,* 446 F.3d 1160, 1163 (11th Cir. 2006), or by producing other evidence "which permits the jury to reasonably disbelieve the employer's proffered

---

[53]     The Eleventh Circuit has "repeatedly and emphatically held that a defendant may terminate an employee for a good or bad reason without violating federal law[,]" because courts "are not in the business of adjudging whether employment decisions are prudent or fair." *Damon v. Fleming Supermarkets of Florida, Inc.,* 196 F.3d 1354, 1361 (11th Cir. 1999), *cert. denied,* 529 U.S. 1109, 120 S.Ct. 1962, 146 L.Ed.2d 793 (2000).

reason." *Steger v. Gen. Elec. Co.,* 318 F.3d 1066, 1079 (11th Cir. 2003). "Any believable evidence which demonstrates a genuine issue of material fact regarding the truth of the employer's explanation may sustain the employee's burden of proof." *Steger,* 318 F.3d at 1079.

*Lloyd, supra,* 857 F.Supp.2d at 1266; *see also Alvarez v. Royal Atlantic Developers, Inc.,* 610 F.3d 1253, 1265-1266, 1266 & 1267 (11th Cir. 2010) ("To show pretext, [plaintiff] must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence. A plaintiff is not allowed to recast an employer's proffered nondiscriminatory reasons or substitute [her] business judgment for that of the employer. Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and [she] cannot succeed by simply quarreling with the wisdom of that reason. . . . We do not sit as a super-personnel department, and it is not our role to second-guess the wisdom of an employer's business decisions—indeed the wisdom of them is irrelevant—as long as those decisions were not made with a discriminatory motive. . . . [Plaintiff's] burden is to show not just that [defendant's] proffered reasons for firing her were ill-founded but that unlawful discrimination was the true reason." (internal citations and quotation marks omitted)). Moreover, "[t]he inquiry into pretext centers on the employer's beliefs, not the employee's beliefs and, to be blunt about it, not on reality as it exists outside of the decision maker's head." *Id.* at 1266, citing *Holifield v. Reno,* 115 F.3d 1555, 1565 (11th Cir. 1997).

The Court finds that plaintiff has met her burden in this regard. In particular, as referenced above, Thomas Hospital's termination policy nowhere defines "job abandonment" and certainly does not list it as a terminable offense. Moreover, this Court cannot expect Mileski to have known that "job abandonment" is effectively

insubordination, refusal to perform assigned duties, or an action that could result in imminent or substantial danger to the life, health, or property of employees, patients, or other customers (admittedly terminable offenses under the defendant's written termination policy) since its own Human Resources director did not recognize this "affinity" when she completed the mandatory EAP referral form. In addition, because of the defendant's approach to this case, at issue here is but one hour of time on May 31, 2013 during which plaintiff clocked in but did not clock out and left the hospital without authorized approval, an admitted "occurrence" under the defendant's written time and attendance policy. Finally, but most importantly, Cain's July 24, 2013 "job abandonment" comments were forward-looking and implicate the Director of Nursing's concerns about whether plaintiff's mental condition posed a risk to patients in the future and whether she would mentally abandon her job in the future, as opposed to being related to the events of May 31, 2013. All of the foregoing, in the undersigned's opinion, creates an issue of fact as to whether the defendant's articulated reason for terminating plaintiff—job abandonment—was untrue. Stated somewhat differently, based on the foregoing evidence, the undersigned finds that a factfinder could disbelieve the stated reason—job abandonment—for termination and conclude that disability discrimination was the true reason for the defendant's decision to terminate plaintiff.

C. **FMLA Claims**.  As recognized by the parties in this case, "[u]nder the FMLA, an eligible employee is entitled to take up to twelve weeks of leave for a serious health condition that makes the employee unable to perform the functions of her job[,]" *Caldwell v. Clayton County School District,* 604 Fed.Appx. 855, 860 (11th Cir. Mar. 23, 2015), citing 29 U.S.C. § 2612(a)(1), and, as well, enjoys the right "following leave 'to be restored by the employer to the position of employment held by the employee when the leave

commenced' or to an equivalent position," *Strickland v. Water Works & Sewer Bd. of the City of Birmingham,* 239 F.3d 1199, 1206 (11th Cir. 2001), quoting 29 U.S.C. § 2614(a)(1). Employers are prohibited by the FMLA from "interfering with, restraining, or denying 'the exercise of or the attempt to exercise' any rights guaranteed under the Act[,]" *Caldwell, supra,* 604 Fed.Appx. at 860, citing 29 U.S.C. § 2615(a)(1), and from discriminating against an employee because she engaged in activity protected by the Act, *Strickland, supra,* 239 F.3d at 1206, citing 29 U.S.C. § 2615(a)(1) & (2); *see* 29 C.F.R. § 825.220(a)(1), (b) & (c) (2013) ("The FMLA prohibits interference with an employee's rights under the law[.] . . . An employer is prohibited from interfering with, restraining, or denying the exercise of (or attempts to exercise) any rights provided by the Act. . . . Interfering with the exercise of an employee's rights would include, for example, not only refusing to authorize FMLA leave, but discouraging an employee from using such leave. . . . [E]mployers cannot use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions; nor can FMLA leave be counted under no fault attendance policies.").

Based upon the foregoing, the Eleventh Circuit has recognized two types of FMLA claims: interference claims and retaliation claims. *Caldwell, supra* (citation omitted); *see also Pereda v. Brookdale Senior Living Communities, Inc.,* 666 F.3d 1269, 1272 (11th Cir. 2012) ("Under section 2615(a) of the FMLA, an employee may bring two types of claims: interference claims, in which an employee asserts that his employer denied or otherwise interfered with his substantive rights under the Act, and retaliation claims, in which an employee asserts that his employer discriminated against him because he engaged in an activity protected by the Act." (citation omitted)); *Strickland, supra,* 239 F.3d at 1206 ("[T]he FMLA creates two types of claims: interference claims, in which an employee asserts that his employer denied or otherwise interfered with his substantive

rights under the Act, and retaliation claims, in which an employee asserts that his employer discriminated against him because he engaged in activity protected by the Act[.]" (internal citations omitted)).

     **1.**     **Interference Claims.**  The Eleventh Circuit has clearly established that in order to prove FMLA interference, Mileski "must demonstrate 'that [she] was denied a benefit to which [she] was entitled under the FMLA,' *Martin v. Brevard Cnty. Pub. Sch.,* 543 F.3d 1261, 1266-67 (11th Cir. 2008), and that she 'has been prejudiced by the violation in some way.' *Ragsdale v. Wolverine World Wide, Inc.,* 535 U.S. 81, 89, 122 S.Ct. 1155, 152 L.Ed.2d 167 (2002)[.]" *Evans v. Books-A-Million,* 762 F.3d 1288, 1295 (11th Cir. 2014); *see Roberts v. Health Ass'n,* 308 Fed.Appx. 568, 569 (2nd Cir. Feb. 3, 2009) ("To bring a successful action under the FMLA, an employee must show (1) that the employer interfered with, restrained, or denied the rights protected by the FMLA, and (2) that the employee has been prejudiced by the violation."); *Bradley v. Army Fleet Support, LLC,* 54 F.Supp.3d 1272, 1279 (M.D. Ala. 2014) ("The Supreme Court has explained that to prevail on a cause of action under the FMLA, the employee must prove interference, but is not entitled to relief unless the employee has been prejudiced by the violation[.]"). "'A [p]laintiff claiming interference must demonstrate by a preponderance of the evidence that she was denied a benefit to which she was entitled[,]'" *Pereda, supra,* 666 F.3d at 1274, quoting *Harley v. Health Ctr. of Coconut Creek,* 487 F.Supp.2d 1344, 1357 (S.D. Fla. 2006); however, "[t]he employee does not have to prove 'that [her] employer intended to deny the benefit, because "the employer's motives are irrelevant."'" *Lamar v. Pilgrim's Pride Corp.* 2015 WL 5440342, *7 (11th Cir. Oct. 15, 2015), quoting *Krutzig v. Pulte Home Corp.,* 602 F.3d 1231, 1235 (11th Cir. 2010), in turn quoting *Strickland, supra,* 239 F.3d at 1208; *see also Martin v. Brevard County Public Schools,* 543 F.3d 1261, 1266-1267 (11th Cir. 2008) ("To prove FMLA interference, an employee must demonstrate that he was denied

a benefit to which he was entitled under the FMLA. An employee need not allege that his employer intended to deny the right; the employer's motives are irrelevant." (internal citations and quotation marks omitted)). In order to prove prejudice as a result of an FMLA violation, a plaintiff need "demonstrate some harm remediable by either 'damages' or 'equitable relief.'" *Evans, supra,* 762 F.3d at 1296, citing *Ragsdale, supra,* 535 U.S. at 89, 122 S.Ct. at 1161 (other citation omitted); *see Hill v. City of New York,* 2015 WL 5719656, *19 (E.D.N.Y. Sept. 28, 2015) ("A plaintiff must show that 'she suffered some injury by reason of the interference with her FMLA rights.'" (citations omitted))

There can be little question but that "[a]n employee has the right following FMLA leave 'to be restored by the employer to the position of employment held by the employee when the leave commenced' or to an equivalent position." *Martin, supra,* 543 F.3d at 1267 (citations omitted). This reinstatement right, however, is not absolute; "rather, 'an employer can deny reinstatement if it can demonstrate that it would have discharged the employee had [s]he not been on FMLA leave.'" *Schaaf v. Smithkline Beecham Corp.,* 602 F.3d 1236, 1241 (11th Cir. 2010), quoting *Martin, supra,* at 1267. In other words, "if an employee is not reinstated, the employer bears the burden of proving that the employee was discharged for independent reasons that were unrelated to the employee's leave." *Id.*, citing *Parris v. Miami Herald Publishing Co.,* 216 F.3d 1298, 1301 n.1 (11th Cir. 2000); *see also Strickland, supra,* 239 F.3d at 1208 ("In other words, if an employer can show that it refused to reinstate the employee for a reason wholly unrelated to the FMLA leave, the employer is not liable."). "Where an employer offers evidence that it denied an employee reinstatement for a reason unrelated to the employee's FMLA leave, and the employee does not offer any evidence to the contrary, summary judgment is due to be granted in favor of the employer on the employee's

interference claim." *Petty v. United Plating, Inc.*, 2012 WL 2047532, *16 (N.D. Ala. May 31, 2012), citing *Schaaf, supra,* 602 F.3d at 1241.

In this case, plaintiff only asserted a retaliation claim in her complaint (*see* Doc. 1, at ¶¶ 56-57 ("[T]he Defendant discriminated/retaliated against the Plaintiff for asserting her federally protected rights under the FMLA by subjecting her to disparate treatment, unwarranted discipline and termination as a direct result of her use of her FMLA leave. [] The defendant intentionally, maliciously, and with reckless indifference discriminated against her in the terms, conditions, [and] benefits of her employment because of her rights under the FMLA.")), but now alleges both interference claims and a retaliation claim in her brief in opposition to the defendant's motion for summary judgment (*see* Doc. 36, at 27-30). It is clear to the Court that plaintiff could have and should have raised in her complaint her interference claim that the defendant's terminated her for an absence from work which was approved as protected FMLA leave (*see* Doc. 36, at 28; *compare id. with* Doc. 1), and that the plaintiff could have established good cause to amend her complaint to add her other interference claim after the time for amendments set forth in the scheduling order (*see* Doc. 13, at ¶ 5 ("Motions for leave to amend the pleadings . . . must be filed not later than **May 1, 2015.**"))—prematurely denying her FMLA benefits to which she was entitled (*see* Doc. 36, at 28)—since she was not aware of the facts supporting such claim until after Pam Bailey's deposition on July 22, 2015 (*see* Doc. 31, Exhibit 5, at 1 (Pam Bailey's deposition taken on July 22, 2015)). Instead of adding her first interference claim by amendment before May 1, 2015, or seeking to add her "premature" interference claim for good cause after Bailey's deposition on July 22, 2015, she waited to raise these claims in her response in opposition to the defendant's motion to summary judgment. (*See* Doc. 36, at 27-28.) This was not the proper course to follow and, therefore, the Court **GRANTS** summary judgment in favor of Thomas

Hospital on both of plaintiff's interference claims, raised for the first time in her opposition to the defendant's motion for summary judgment.[54] *Compare Manley v. DeKalb County, Georgia,* 587 Fed.Appx. 507, 511 (11th Cir. Sept. 3, 2014) ("We have held that a plaintiff may not add new claims to her complaint through an argument in a brief opposing a motion for summary judgment. The proper avenue for adding a new claim at the summary judgment stage is to ask the district court for leave to amend pursuant to Rule 15(a).") *with Gilmour v. Gates, McDonald & Co.,* 382 F.3d 1312, 1315 (11th Cir. 2004) ("A plaintiff may not amend her complaint through argument in a brief opposing summary judgment. . . . Liberal pleading does not require that, at the summary judgment stage, defendants must infer all possible claims that could arise out of facts set forth in the complaint.").[55]

---

[54] To the extent plaintiff intends to suggest that her use of the words discrimination and/or discrimination in Count II of the complaint should be liberally read as her attempt to raise an interference claim (*see* Doc. 36, at 27-28), the Court finds any such implicit argument unavailing since the Eleventh Circuit consistently describes interference claims as those "in which an employee asserts that his employer denied or otherwise interfered with his substantive rights under the Act," whereas retaliation claims are described as those "in which an employee asserts that his employer ***discriminated*** against him because he engaged in activity protected by the Act[.]" *Strickland, supra,* 239 F.3d at 1206 (emphasis supplied). A defendant is entitled to notice of what it must defend against and nothing about plaintiff's complaint gave notice that she was asserting an FMLA interference claim against Thomas Hospital.

[55] Moreover, with respect to plaintiff's interference claim that the defendant prematurely ended her FMLA leave on or about July 10, 2013 without any explanation for its actions (*see* Doc. 36, at 28), this occurring because of a miscalculation of plaintiff's FMLA hours by Pam Bailey, the Court discerns no prejudice or injury to plaintiff since she remained on short-term disability (thereby receiving her pay and benefits) and her job was not posted or replaced during the period of her FMLA and STD leave. *Compare, e.g., Roberts, supra,* 308 Fed.Appx. at 570 ("[I]t is undisputed that HA paid Roberts for twelve weeks' worth of benefits, which is all she would have been entitled to had HA respected her right to FMLA leave. Although Roberts can likely show that HA interfered with her FMLA rights, because there is no evidence that the violation was prejudicial, the District Court did not err in dismissing her claim.") *with Evans, supra,* 762 F.3d at 1295 (recognition by the Eleventh Circuit that to prove FMLA interference, a plaintiff must demonstrate not only that she was denied a benefit to which she was entitled but also that she was prejudiced by the violation in some way) and *Hill, supra,* at *19 ("A plaintiff must show that 'she suffered some injury by reason of the interference with her FMLA rights.'" (citations omitted)).

2.   **FMLA Retaliation**.   "To prove a retaliation claim under the FMLA, the plaintiff must show that her employer intentionally discriminated against her for having exercised an FMLA right." *Caldwell, supra,* 604 Fed.Appx. at 860, citing *Martin, supra,* 543 F.3d at 1267; *see also id.* ("In other words, the plaintiff must show that her 'employer's actions were motivated by an impermissible retaliatory or discriminatory animus.'" (citations omitted)).

> Where, as here, the plaintiff presents no direct evidence of retaliatory intent, [this Court] analyze[s] the circumstantial evidence presented under the burden-shifting framework of *McDonnell Douglas*. Under that approach, the plaintiff must first establish a *prima facie* case of retaliation. This requires a showing that (1) she engaged in activity protected by the FMLA, (2) she suffered an adverse employment decision, and (3) the adverse decision was causally related to the protected activity. . . . If the plaintiff establishes a *prima facie* case of retaliation, the employer must articulate a legitimate, non-discriminatory reason for the adverse employment action. Once the employer makes this proffer, the plaintiff must demonstrate that the employer's reason was actually a pretext for discrimination.[56] Evidence used to establish a *prima facie* case may also be used to establish pretext.

*Id.* (internal citations; footnote omitted; footnote added); *see also Martin, supra,* 543 F.3d at 1268 (same); *Hurlbert, supra,* 439 F.3d at 1297 (same); *Bradley v. Army Fleet Support, LLC,* 54 F.Supp.3d 1272, 1279 (M.D. Ala. 2014) (same); *Sparks v. Sunshine Mills, Inc.,* 2013 WL 4760964, *14 (N.D. Ala. Sept. 4, 2013) (same), *aff'd,* 580 Fed.Appx. 759 (11th Cir. Sept. 12, 2014).

In this case, it is undisputed that Mileski engaged in protected activity and suffered an adverse employment decision in the form of termination. (*See* Doc. 33, at 24 ("The first and second elements of the prima facie case are not disputed.").) Therefore,

---

[56]   "'[T]he employee must then show that the employer's proffered reason was pretextual by presenting evidence "sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision."'" *Lamar, supra,* at *10, quoting *Martin, supra,* 543 F.3d at 1268, in turn quoting *Hurlbert v. St. Mary's Health Care Sys., Inc.,* 439 F.3d 1286, 1297 (11th Cir. 2006).

the only *prima facie* element at issue in this matter is causal connection. The Eleventh Circuit has held that "to demonstrate a causal connection a plaintiff needs to demonstrate only that the protected activity and adverse action were not completely unrelated." *Caldwell, supra,* 604 Fed.Appx. at 860, citing *Hogdon v. Jackson,* 393 F.3d 1211, 1220 (11th Cir. 2004).

> To do that, "the plaintiff must generally show that the decision maker was aware of the protected conduct at the time of the adverse employment action." *Brungart v. BellSouth Telecomms., Inc.,* 231 F.3d 791, 799 (11th Cir. 2000). Close temporal proximity between the protected conduct and the adverse action generally is sufficient to establish a causal connection. However, temporal proximity alone is insufficient when unrebutted evidence indicates that the decision maker did not know about the employee's protected conduct when the adverse action occurred.

*Id.* (some internal citations omitted); *Strickland, supra,* 239 F.3d at 1207-1208 ("[Proximity in time] evidence cannot satisfy the third element in a case, like the one here, in which the 'unrebutted evidence [is] that the decision maker did not have knowledge that the employee [had engaged, or was attempting to engage,] in protected activity.' As we said in *Brungart,* '[a] decision maker cannot have been motivated to retaliate by something unknown to him.'" (internal citations omitted)); *cf. Gilliard v. Georgia Dep't of Corrections,* 500 Fed.Appx. 860, 864 (11th Cir. Dec. 7, 2012) ("The causation element may be shown by the temporal proximity of the complaints to the adverse employment action, '[b]ut mere temporal proximity, without more, must be "very close."'").

Here, plaintiff was approved for FMLA leave for all but one hour on May 31, 2013, and the decision makers were aware of her FMLA leave prior to the termination decision on July 24, 2013. Indeed, but for Bailey's miscalculation of the hours of FMLA leave available to plaintiff, Mileski would have been covered by the FMLA on the date of her termination. Given this temporal proximity, the Court finds that, at the very least,

plaintiff has created a genuine issue of material fact regarding the third element (causal connection) of her *prima facie* case.

There can be little question but that the defendant has satisfied its very light burden of proffering a legitimate, non-discriminatory reason for its termination of plaintiff, namely that plaintiff did not report to her assigned duties and, instead, left the hospital without clocking out and without authorized approval on May 31, 2013, which it insists constitutes job abandonment. Accordingly, the Court turns to the pivotal issue of whether the defendant's proffered reason is mere pretext for unlawful FMLA termination.

"Pretext means that the reason given by the employer was not the real reason for the adverse employment decision." *Gilliard, supra,* 500 Fed.Appx. at 864-865 (citation omitted).

> A reason cannot be proved to be a pretext for discrimination unless it is shown both that the reason was false, and that discrimination was the real reason. In this respect, conclusory allegations or unsupported assertions of discrimination, without more, do not raise an inference of pretext where an employer has offered extensive evidence of legitimate, nondiscriminatory reasons for its actions. Instead, the plaintiff must meet the proffered reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason. A plaintiff will withstand summary judgment by demonstrating such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence.

*Id.* at 865 (internal citations, quotation marks, brackets, and emphasis omitted); *see also Lamar, supra,* at *12 ("In evaluating an employee's proof of pretext, the Supreme Court has instructed that '[i]t is not enough . . . to *disbelieve* the employer; the factfinder must *believe* the plaintiff's explanation of intentional discrimination.' Nevertheless, disproving an employer's explanation may give rise to a permissible inference that the employer intentionally retaliated against an employee because dishonesty about a

material fact may be 'affirmative evidence of guilt' or render retaliation the most likely alternative explanation for the employer's action. On the other hand, an employer would be entitled to summary judgment 'if the plaintiff created only a weak issue of fact as to whether the employer's was untrue and there was abundant and uncontroverted evidence that no discrimination had occurred.' . . . Preliminarily, the Court notes that while close temporal proximity 'is generally "sufficient circumstantial evidence to create a genuine issue of material fact of a causal connection,"' it is 'probably insufficient to establish pretext by itself.'"(internal citations omitted)); *see Hurlbert, supra,* 439 F.3d at 1298 (indicating that close temporal proximity between employee's request for leave and his termination—that is, no more than 2 weeks—was evidence of pretext, "though probably insufficient to establish pretext by itself."). The Eleventh Circuit has recognized that "an employer's failure to articulate clearly and consistently the reason for an employee's discharge may serve as evidence of pretext[,]" *Hurlbert, supra,* 439 F.3d at 1298 (citations omitted), as can "an employer's deviation from its own standard procedures[.]" *Id.* at 1299 (citations omitted).

As previously indicated in the ADA portion of this opinion, this case is "all about" the first hour of May 31, 2013, as the defendant effectively "reserved" the first hour of this day for purposes of making its employment decision, the day plaintiff left the hospital after clocking in but not clocking out and without authorized approval. In other words, by its actions, the defendant has made this case a "time" case and when properly viewed, the defendant's reliance on "job abandonment" becomes untenable, on summary judgment, not only because that phrase is nowhere specifically defined or listed in its own written termination policy as a terminable offense but, as well, because of the defendant's admission that plaintiff's actions during the first hour of May 31, 2013—that is, leaving work early without authorized approval—was an occurrence

under its written attendance policy. This Court has previously found evidence of "pretext" with respect to plaintiff's ADA claim and there can be no question but that Mileski's disability (that is, depression) caused the need for her FMLA leave. Therefore, in light of the aforesaid temporal proximity between plaintiff's FMLA leave and her termination this Court need conclude, on summary judgment, a permissible inference arises—given that the employer's explanation cannot be believed—that the defendant intentionally retaliated against plaintiff.

## CONCLUSION

For the reasons set forth above, defendant's motion for summary judgment (Doc. 30) is **GRANTED IN PART** and **DENIED IN PART**.

**DONE** and **ORDERED** this 31st day of March, 2016.

s/WILLIAM E. CASSADY
**UNITED STATES MAGISTRATE JUDGE**